**No. 14-35043**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

RALPH MAUGHAN, DEFENDERS OF WILDLIFE, WESTERN
WATERSHEDS PROJECT, WILDERNESS WATCH,
and CENTER FOR BIOLOGICAL DIVERSITY,

Plaintiffs-Appellants,

v.

TOM VILSACK, U.S. Secretary of Agriculture; TOM TIDWELL, Chief, U.S.
Forest Service; NORA RASURE, Regional Forester of Region Four of the U.S.
Forest Service; KEITH LANNOM, Payette National Forest Supervisor; and
VIRGIL MOORE, Director, Idaho Department of Fish and Game,

Defendants-Appellees.

_____

Appeal from the United States District Court for the District of Idaho
Case No. 4:14-cv-00007-EJL—Hon. Edward J. Lodge, District Judge

_____

## APPELLANTS' BRIEF

Timothy J. Preso
Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, plaintiffs-appellants Defenders of Wildlife, Western Watersheds Project, Wilderness Watch, and Center for Biological Diversity hereby certify that none of the plaintiff-appellant organizations has a parent corporation and that no publicly held corporation holds ten percent or more of any appellant organization's stock.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION...........................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE .............................................................2

STATEMENT OF FACTS ..................................................................8

I.     THE FRANK CHURCH-RIVER OF NO RETURN WILDERNESS ..........8

II.    GRAY WOLVES IN THE FRANK CHURCH WILDERNESS .................10

III.   THE WOLF EXTERMINATION PROGRAM ...............................12

IV.    THE DECISION BELOW...............................................15

SUMMARY OF THE ARGUMENT .................................................16

ARGUMENT ...............................................................18

I.     STANDARD OF REVIEW .............................................18

II.    APPELLANTS CHALLENGE FINAL AGENCY ACTION AND
       AGENCY ACTION UNLAWFULLY WITHHELD ...................................20

       A.     Appellants Challenge Reviewable Final Agency Action....................20

       B.     Appellants Challenge Agency Action Unlawfully Withheld..............26

III.   APPELLANTS HAVE ESTABLISHED A LIKELIHOOD OF
       SUCCESS OR SERIOUS LEGAL QUESTIONS ON THE MERITS.........31

       A.     Appellants Have Established a Likelihood of Success or
              Serious Legal Questions on the Merits of their National Forest
              Management Act Claim ................................................31

       B.     Appellants Have Established a Likelihood of Success or
              Serious Legal Questions on the Merits of their Wilderness Act
              Claim ................................................................35

i

C.    Appellants Have Established a Likelihood of Success or Serious Legal Questions on the Merits of Their Claim Under the Service's Special Use Permitting Regulations ............................ 42

D.    Appellants Have Established a Likelihood of Success or Serious Legal Questions on the Merits of their National Environmental Policy Act Claim ....................................................... 47

IV.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN HOLDING THAT APPELLANTS MUST DEMONSTRATE A THREAT TO THE ENTIRE GRAY WOLF SPECIES TO ESTABLISH A LIKELIHOOD OF IRREPARABLE HARM ................... 53

V.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST SUPPORT PRELIMINARY INJUNCTIVE RELIEF ................................ 56

VI.    THIS COURT SHOULD ISSUE THE REQUESTED INJUNCTION ........ 57

CONCLUSION ....................................................................................... 59

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alaska v. Andrus,
    591 F.2d 537 (9th Cir. 1979) ...............................................................50

Alliance for the Wild Rockies v. Cottrell,
    632 F.3d 1127 (9th Cir. 2011) ...................................................... 18-19

Alliance for the Wild Rockies v. Salazar,
    672 F.3d 1170 (9th Cir. 2012) ...........................................................12

Amoco Prod. Co. v. Vill. of Gambell,
    480 U.S. 531 (1987)....................................................................54, 56

Barrick Goldstrike Mines v. Browner,
    215 F.3d 45 (D.C. Cir. 2000)...............................................................22

Bennett v. Spear,
    520 U.S. 154 (1997).........................................................................23

California ex rel. Van De Kamp v. Tahoe Regional Planning Agency,
    766 F.2d 1319 (9th Cir. 1985) .............................................................59

Citizens for Smart Growth v. Sec'y of Transp.,
    669 F.3d 1203 (11th Cir. 2012) ...........................................................58

Ctr. for Biological Diversity v. Veneman,
    394 F.3d 1108 (9th Cir. 2005) .............................................................32

Defenders of Wildlife v. Andrus,
    627 F.2d 1238 (D.C. Cir. 1980).................................................... 50-51

Defenders of Wildlife v. Salazar,
    729 F. Supp. 2d 1207 (D. Mont. 2010)...............................................10

Earth Island Inst. v. U.S. Forest Serv.,
    351 F.3d 1291 (9th Cir. 2003) .............................................................19

Ex parte Young,
    209 U.S. 123 (1908).....................................................................1, 58

Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.,
  689 F. Supp. 2d 891 (W.D. Ky. 2010).................................................45

Friends of the Columbia Gorge v. Elicker,
  598 F. Supp. 2d 1136 (D. Or. 2009), vacated pursuant to settlement
  agreement, 2011 WL 3205773 (D. Or. July 27, 2011).......................43

Friends of the Earth v. Brinegar,
  518 F.2d 322 (9th Cir. 1975) ..............................................................59

FTC v. Affordable Media,
  179 F.3d 1228 (9th Cir. 1999) ...............................................................8

Fund for Animals v. Lujan,
  962 F.2d 1391 (9th Cir. 1992) .............................................................58

Gherebi v. Bush,
  374 F.3d 727 (9th Cir. 2004) ..............................................................43

Greater Yellowstone Coal. v. Flowers,
  321 F.3d 1250 (10th Cir. 2003) ..........................................................54

High Sierra Hikers Ass'n v. Blackwell,
  390 F.3d 630 (9th Cir. 2004) ......................................................passim

Humane Soc'y of U.S. v. Gutierrez,
  523 F.3d 990 (9th Cir. 2008) ......................................... 17-18, 54, 56

Hunt v. Nat'l Broadcasting Co.,
  872 F.2d 289 (9th Cir. 1989) ................................................................8

Kleppe v. New Mexico,
  426 U.S. 529 (1976)............................................................................39

Knox v. Serv. Employees Intern. Union, Local 1000,
  ---U.S.---, 132 S. Ct. 2277 (2012).......................................................7

KOLA, Inc. v. U.S. Forest Serv.,
  882 F.2d 361 (9th Cir. 1989) ....................................................... 45-46

Kootenai Tribe v. Veneman,
 313 F.3d 1094 (9th Cir. 2002), abrogated on other grounds by
 Wilderness Soc'y v. U.S. Forest Serv., 630 F.3d 1173 (9th Cir. 2011)
 (en banc) ................................................................................................. 56-57

Lands Council v. McNair,
 537 F.3d 981 (9th Cir. 2008) (en banc), overruled on other grounds
 by Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046
 (9th Cir. 2009) ............................................................................................ 33

Lands Council v. Powell,
 395 F.3d 1019 (9th Cir. 2004) ................................................................... 32

League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency,
 558 F.2d 914 (9th Cir. 1977) ..................................................................... 58

Leigh v. Salazar,
 677 F.3d 892 (9th Cir. 2012) . ...................................................................... 7

LGS Architects, Inc. v. Concordia Homes of Nev.,
 434 F.3d 1150 (9th Cir. 2006), overruled on other grounds as
 recognized by Perfect 10 v. Google, 653 F.3d 976 (9th Cir. 2011) ............ 8

Lujan v. Nat'l Wildlife Fed'n,
 497 U.S. 871 (1990) ................................................................................... 23

Meister v. U.S. Dep't of Agric.,
 623 F.3d 363 (6th Cir. 2010) ..................................................................... 40

Nat'l Audubon Soc'y, Inc. v. Davis,
 307 F.3d 835 (9th Cir. 2002) ............................................................. 39-40, 58

Nat'l Wildlife Fed'n v. Espy,
 45 F.3d 1337 (9th Cir. 1995) .................................................................. 57-58

Native Ecosystems Council v. U.S. Forest Serv.,
 418 F.3d 953 (9th Cir. 2005) ..................................................................... 30

Norton v. S. Utah Wilderness Alliance,
 542 U.S. 55 (2004) ............................................................................. passim

Or. Natural Desert Ass'n v. U.S. Forest Serv.,
 465 F.3d 977 (9th Cir. 2006) ......................................................... 22, 23, 24

Ramsey v. Kantor,
    96 F.3d 434 (9th Cir. 1996) ..........................................................51, 52

Rattlesnake Coal. v. EPA,
    509 F.3d 1095 (9th Cir. 2007) .............................................................50

S. Carolina Wildlife Fed'n v. Limehouse,
    549 F.3d 324 (4th Cir. 2008) ...............................................................58

S.W. Williamson Cnty. Cmty. Ass'n v. Slater,
    243 F.3d 270 (6th Cir. 2001) ...............................................................58

Safeway Stores, Inc. v. Brown,
    138 F.2d 278 (Emerg. Ct. App. 1943) ..................................................29

Save Our Sonoran, Inc. v. Flowers,
    408 F.3d 1113 (9th Cir. 2005) .............................................................49

Shell Offshore, Inc. v. Greenpeace,
    709 F.3d 1281 (9th Cir. 2013) ..........................................................8, 19

Sierra Club v. Hodel,
    848 F.2d 1068 (10th Cir. 1988), overruled on other grounds by
    Vill. of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970
    (10th Cir. 1992).................................................................... 51, 58-59

Siskiyou Regional Educ. Project v. U.S. Forest Serv.,
    565 F.3d 545 (9th Cir. 2009) ..........................................................24, 26

Sw. Voter Registration Educ. Project v. Shelley,
    344 F.3d 914 (9th Cir. 2003) (en banc) ...............................................19

United States v. Hinkson,
    585 F.3d 1247 (9th Cir. 2009) (en banc) .............................................19

W. Radio Servs. Co. v. Espy,
    79 F.3d 896 (9th Cir. 1996) .................................................................45

White Tanks Concerned Citizens, Inc. v. Strock,
    563 F.3d 1033 (9th Cir. 2009) .............................................................49

Whitman v. Am. Trucking Ass'ns, Inc.,
    531 U.S. 457 (2001).............................................................................21

Wild Fish Conservancy v. Jewell,
   730 F.3d 791 (9th Cir. 2013) ............................................................20-21, 22-23

Wilderness Soc'y v. U.S. Fish & Wildlife Serv.,
   353 F.3d 1051 (9th Cir. 2003) (en banc) ..................................35, 37, 38

Wilderness Watch v. U.S. Fish and Wildlife Serv.,
   629 F.3d 1024 (9th Cir. 2010) ..........................................................38

Winter v. Natural Res. Def. Council,
   555 U.S. 7 (2008) ...............................................................................18

Wolf Recovery Found. v. U.S. Forest Serv.,
   692 F. Supp. 2d 1264 (D. Idaho 2010) ...............................10, 11, 37, 55

Wyoming v. United States,
   279 F.3d 1214 (10th Cir. 2002) ........................................................40

## STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. § 551(8) ..............................................................................21
   § 551(13) ......................................................................21, 22, 26
   §§ 701-706 ...........................................................................20
   § 702 .......................................................................................1
   § 704 ....................................................................................1, 16
   § 706(1) .............................................................................passim
   § 706(2)(A) ........................................................................passim

16 U.S.C. §§ 1131-1136 ...................................................................2, 4
   § 1131(a) ...............................................................................37
   § 1131(c) ...........................................................................35, 40
   § 1133(b) ...................................................... 29, 35-36, 38
   § 1133(b)-(c) .........................................................................37
   § 1133(d)(7) ..........................................................................40
   § 1531, et seq. .....................................................................10
   §§ 1600-1614 .........................................................................4
   § 1604(a) ......................................................................... 31-32
   § 1604(i) .....................................................................2, 27, 32, 34

vii

28 U.S.C. § 1292(a)(1)............................................................................1
     § 1331 ...........................................................................................1

42 U.S.C. §§ 4321-4370h ...................................................................2, 4
     § 4332(2)(C)................................................................................47

43 U.S.C. § 1732(b) ......................................................................... 39-40

Central Idaho Wilderness Act of 1980, Pub .L. No. 96-312, Stat. 948,
     96th Cong. (1980) ........................................................................9

## Regulations and Administrative Materials

36 C.F.R. Pt. 251, subpart B ..............................................................2, 4

36 C.F.R. §§ 251.50, 251.54 .................................................................27
     § 251.50(a) ..................................................................................42
     § 251.50(c) .............................................................................. 42-43
     § 251.50(e)(2).........................................................................passim
     § 251.54(e)(1)(i) ...................................................................43, 52
     § 251.54(e)(1)(ii) ..................................................................43, 52
     § 251.54(e)(2).............................................................................43
     § 293.2(a) ...................................................................................37
     § 293.2(c) ..............................................................................36, 37

40 C.F.R. § 1500.1(a).........................................................................47
     §§ 1501.4, 1508.9.......................................................................47
     § 1508.8......................................................................................49
     § 1508.18 ................................................................ 48, 49, 50, 51-52
     § 1508.18(a) ...............................................................................48
     § 1508.18(b)(4)...........................................................................48
     § 1508.27(b)(3), (10)..................................................................48

## OTHER AUTHORITIES

Federal Rule of Appellate Procedure 4(a)(1)(B) ........................................................1

Idaho Dep't of Fish & Game, Idaho Elk Mgmt. Plan 2014-2024 (Jan. 2014) ..........6

Idaho Dep't of Fish & Game, Predation Mgmt. Plan for the
  Middle Fork Elk Zone 10-11 (Feb. 2014) ..................................................6, 8, 55

Ralph Maughan & Jackie Maughan, The Hiker's Guide to Idaho
  (Falcon Press 1984) ......................................................................................... 8-9

## STATEMENT OF JURISDICTION

(A)    The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (waiver of federal defendants' sovereign immunity).  The district court had jurisdiction over Appellants' claims for declaratory and prospective injunctive relief against Idaho Department of Fish and Game Director Virgil Moore pursuant to 28 U.S.C. § 1331 and the doctrine of Ex parte Young, 209 U.S. 123, 159-60 (1908).

(B)    This Court has jurisdiction of this appeal from the district court's order denying preliminary injunctive relief pursuant to 28 U.S.C. § 1292(a)(1).

(C)    The district court issued a memorandum decision and order denying Appellants' motion for a temporary restraining order and preliminary injunction on January 17, 2014.  Appellants noticed this appeal the same day, within the time allowed by Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

I.    Whether the district court erred as a matter of law in concluding that Appellants failed to establish a likelihood of success or serious legal questions on the merits of their claims because they have not challenged final agency action or agency action unlawfully withheld within the meaning of the Administrative Procedure Act, 5 U.S.C. §§ 704, 706(1), (2)(A).

II.   Whether the district court erred as a matter of law in concluding that Appellants failed to establish a likelihood of success or serious legal questions on the merits of their claims that the federal defendants violated the National Forest Management Act, 16 U.S.C. § 1604(i); the Wilderness Act, 16 U.S.C. §§ 1131-1136; U.S. Forest Service special use permitting regulations, 36 C.F.R. Pt. 251, subpart B; and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370h, by assisting, waiving permit requirements for, and failing to take required action to review and regulate the Idaho Department of Fish and Game's program to exterminate wolf packs in the Frank Church-River of No Return Wilderness.

III.   Whether the district court erred as a matter of law in concluding that Appellants failed to establish a likelihood of irreparable harm warranting preliminary injunctive relief because they did not prove that the Idaho Department of Fish and Game's wolf extermination program threatens the survival of the entire gray wolf species.

IV.   Whether the balance of hardships and public interest support preliminary injunctive relief.

## STATEMENT OF THE CASE

This case challenges the U.S. Forest Service's disregard of its legal duties to manage and protect the Frank Church-River of No Return Wilderness ("Frank Church Wilderness"), the largest forested wilderness in the continental United

States.  The Forest Service (the "Service") has violated these duties by allowing and facilitating a program undertaken by the Idaho Department of Fish and Game to exterminate two packs of gray wolves from the Middle Fork region of the wilderness in an attempt to inflate the local elk population for the benefit of commercial outfitters and recreational hunters.  To Appellants' knowledge, this program—which is designed to exterminate native wildlife deep within a congressionally designated wilderness, far removed from any conflicts with livestock or human development, to promote commercial and recreational interests—is unprecedented.

This controversy began in mid-December 2013, when the Idaho Department of Fish and Game ("IDFG") dispatched a hired hunter-trapper into the Frank Church Wilderness to exterminate two resident wolf packs—the Golden Creek and Monumental Creek packs.  With full knowledge of IDFG's plans, the Service actively assisted the wolf extermination program by authorizing IDFG's hunter-trapper to use a Forest Service cabin within the wilderness as a base of operations. In addition, the Service granted IDFG's program a waiver from special use permitting requirements, which allowed the program to proceed without public notice or federal oversight.

After learning from press reports and independent investigation about IDFG's program and the Service's role in allowing and facilitating its

3

implementation, Appellants Ralph Maughan, Defenders of Wildlife, Western

Watersheds Project, and Wilderness Watch filed a complaint in the district court on

January 6, 2014.  ER 320.[1]  The Center for Biological Diversity joined as a

plaintiff via an amended complaint filed on January 8, 2014.  ER 321.  Appellants

challenged the Service's decisions to authorize the use of federal facilities for

IDFG's wolf extermination program and to approve the program without

undertaking mandatory environmental review and approval procedures and in

derogation of its statutory duty to preserve the wilderness character of the Frank

Church Wilderness.  Appellants raised claims under the National Forest

Management Act ("NFMA"), 16 U.S.C. §§ 1600-1614; the Wilderness Act, 16

U.S.C. §§ 1131-1136; the Service's special use permitting regulations, 36 C.F.R.

Pt. 251, subpart B; and the National Environmental Policy Act ("NEPA"), 42

U.S.C. §§ 4321-4370h.  Because IDFG's wolf extermination was ongoing, on

January 7, 2014, Appellants moved for a temporary restraining order and

preliminary injunction to preserve the status quo and prevent further wolf

extermination activities in the Frank Church Wilderness pending adjudication of

their claims.  ER 321.  Appellants documented their standing to sue through

declarations filed in support of the motion.  ER 19-49.  Appellants renewed their

---

[1] Appellants' Excerpts of Record are cited as "ER," followed by the page number.

motion for preliminary injunctive relief on January 8, 2014, upon learning that IDFG's hunter-trapper had already killed seven wolves.  ER 321.

On January 17, 2014, after full briefing, the district court issued a memorandum decision and order denying Appellants' motions.  ER 1.  Appellants noticed this appeal the same day and sought an injunction pending appeal in the district court, which was denied on January 27, 2014.  ER 323-24.  Appellants also filed an emergency motion for an injunction pending appeal before this Court. IDFG continued its wolf extermination program apace throughout these proceedings.  However, on January 28, 2014—the day its response to Appellants' emergency motion was due—IDFG notified this Court that it was temporarily suspending the wolf extermination program after killing nine wolves.  See Decl. of Jeff Gould (App. Ct. Dkt. 11-2).  Accordingly, Appellants withdrew their emergency motion for an injunction pending appeal. [2]

Although IDFG temporarily suspended the challenged program in the face of Appellants' emergency injunction motion, IDFG maintains that it may resume wolf extermination in the Frank Church Wilderness as early as July 1, 2014.  Id. ¶ 6.  Moreover, IDFG has since made clear that its recent effort to exterminate the

---

[2] Because none of the wolves in the targeted wolf packs is collared for monitoring, it is unknown precisely how many wolves make up the two packs and how many wolves survived IDFG's recent extermination efforts.  See ER 286 (IDFG & Nez Perce Tribe Wolf Monitoring Report).

Golden Creek and Monumental Creek wolf packs was merely the first step in a much more ambitious campaign, as IDFG intends to eliminate 60 percent of the wolves residing in the Middle Fork area of the Frank Church Wilderness— reducing the population from approximately 93 wolves to 35-40 wolves—in order to inflate the elk population above levels that would be sustained by natural predator-prey interactions.  <u>See</u> Idaho Dep't of Fish & Game, Predation Mgmt. Plan for the Middle Fork Elk Zone 10-11 (Feb. 2014).[3]  IDFG has made clear that effective implementation of this program will necessitate several successive years of wolf killing.  <u>See id.</u>; <u>see also</u> Idaho Dep't of Fish & Game, Idaho Elk Mgmt. Plan 2014-2024, at 60 (Jan. 2014) (stating that inflation of elk population will require IDFG to "[h]arvest >75% of wolves and then maintain lower wolf numbers annually for 3-5 years in specific focal areas").[4]  Accordingly, IDFG's recent suspension decision represents only a short-term lull in the state's ongoing wolf extermination efforts in the Frank Church Wilderness.  Further, as the course of

_____

[3] Appellants have filed a motion for judicial notice of IDFG's predation management plan concurrently with this brief.  The plan is also available at http://fishandgame.idaho.gov/public/wildlife/planMiddleForkPredation.pdf (last visited Feb. 13, 2014).

[4] Appellants have filed a motion for judicial notice of IDFG's final elk management plan concurrently with this brief.  The plan is also available at http://fishandgame.idaho.gov/public/wildlife/?getpage=324 (last visited Feb. 13, 2014).  The final version was adopted on January 15, 2014, after Appellants filed their complaint in the district court.  The portions of the draft plan filed in the district court and included in Appellants' record excerpts, ER 258-81, were adopted in the final plan.

6

this litigation to date makes clear, efforts to halt further wolf extermination through

motion proceedings in the district court are unlikely to succeed, and significant

wolf killing may occur before Appellants are able to seek even emergency relief

from this Court.  Given IDFG's intention to resume the challenged activity and

Appellants' inability to secure timely relief in the district court, adjudication of this

appeal is necessary to prevent further irreparable harm to the wilderness character

of the Frank Church Wilderness pending a final judgment in this case. [5]

---

[5] IDFG's temporary suspension of wolf extermination in the Frank Church
Wilderness does not moot Appellants' claims or request for a preliminary
injunction.  Appellants seek a preliminary injunction prohibiting the Service and
IDFG from conducting, authorizing, or facilitating any wolf extermination
activities in the Frank Church Wilderness pending final judgment.  See Mem. in
Supp. of Pls.' Mot. for Temporary Restraining Ord. & Preliminary Injunction, Dist.
Ct. Dkt. No. 8-1, at 20.  IDFG has asserted only that it will not resume wolf
extermination in the Middle Fork area until July 1, 2014, and it is unlikely that
Appellants can fully litigate their claims before IDFG's temporary suspension
expires.  As a result, this Court can grant effective relief and the appeal is not
moot.  See, e.g., Knox v. Serv. Employees Intern. Union, Local 1000, ---U.S.---,
132 S. Ct. 2277, 2287 (2012) ("A case becomes moot only when it is impossible
for a court to grant any effectual relief whatever to the prevailing party.  As long as
the parties have a concrete interest, however small, in the outcome of the litigation,
the case is not moot.") (quotations, alteration, and citation omitted).  See also
Leigh v. Salazar, 677 F.3d 892, 896 (9th Cir. 2012) (claim seeking injunction
guaranteeing reporter's access to horse roundups not moot because it sought access
to all roundups at federal facility, not just single roundup that occurred before
appeal, and there was a "real possibility" of another roundup at the site). *(cont'd…)*

## STATEMENT OF FACTS

## I.    THE FRANK CHURCH-RIVER OF NO RETURN WILDERNESS

At nearly 2.4 million acres, the Frank Church-River of No Return Wilderness is the largest forested wilderness in the United States, spanning the boundaries of four National Forests in central Idaho.  As described in Appellant Ralph Maughan's hiking guide to the area, "[w]ith the exception of the subdued topography of Elk Creek on the south end of the wilderness and the vast plateau called Chamberlain Basin, the wilderness is a sea with waves of one steep ridge after another.  The major canyons of the Middle Fork and main Salmon [Rivers]

---

Further, it is "well-settled that an action for an injunction does not become moot merely because the conduct complained of was terminated, if there is a possibility of recurrence, since otherwise the defendant[s] would be free to return to [their] old ways."  FTC v. Affordable Media, 179 F.3d 1228, 1237 (9th Cir. 1999) (quotation and emphasis omitted) (alterations in original).  Because IDFG intends to conduct additional wolf extermination in the Frank Church Wilderness, ER 280-81; IDFG Predation Mgmt. Plan 10-11, supra n. 3, the defendants-appellees cannot prove that it is "absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur," and the appeal is not moot. Affordable Media, 179 F.3d at 1238 (quotations omitted).  In addition, Appellants' claims and request for preliminary injunctive relief are exempt from the mootness doctrine because "the duration of the challenged action…[is] too short to be fully litigated" and "there [is] a reasonable likelihood that the same party will be subject to the action again."  Shell Offshore, Inc. v. Greenpeace, 709 F.3d 1281, 1287 (9th Cir. 2013) (quotation omitted).  These mootness exceptions for "voluntary cessation" of the challenged conduct and controversies "capable of repetition yet evading review" apply with equal force in a preliminary injunction appeal.  See, e.g., id.; LGS Architects, Inc. v. Concordia Homes of Nev., 434 F.3d 1150, 1153-54 (9th Cir. 2006), overruled on other grounds as recognized by Perfect 10 v. Google, 653 F.3d 976, 979 (9th Cir. 2011); Hunt v. Nat'l Broadcasting Co., 872 F.2d 289, 291-92 (9th Cir. 1989).

twist through the mountains, in places almost 7,000 feet deep, deeper than the Grand Canyon."  Ralph Maughan & Jackie Maughan, <u>The Hiker's Guide to Idaho</u> 56 (Falcon Press 1984).

Congress recognized the "immense national significance" of "the famous 'River of No Return'" and surrounding wild lands by establishing the Frank Church Wilderness in 1980.  Central Idaho Wilderness Act of 1980, Pub. L. No. 96-312, § 2(a)(1), 94 Stat. 948, 96th Cong. (1980).  In so doing, Congress specifically sought "to provide statutory protection for the lands and waters and the wilderness-dependent wildlife…which thrive within this undisturbed ecosystem." <u>Id.</u> § 2(a)(2).  Congress's desire to preserve the area's wildlife resources was well founded; the Frank Church Wilderness harbors a great diversity and abundance of wildlife species, including elk, bighorn sheep, mountain goats, mule deer, mountain lions, black bears, moose, whitetail deer, lynx, fishers, and wolverines. And the Frank Church Wilderness is home to a wilderness icon—the gray wolf. Six documented wolf packs reside in the portion of the wilderness encompassing the Middle Fork of the Salmon River, including the Golden Creek and Monumental Creek packs that were targeted by IDFG during the winter of 2013-14.  ER 253-54.

## II.    GRAY WOLVES IN THE FRANK CHURCH WILDERNESS

Gray wolves are native to central Idaho and the Northern Rockies region. Though wolves were once abundant throughout most of North America, aggressive hunting and "an active, government-sponsored eradication program resulted in the extirpation of wolves from most of their range in the lower-48 states." Defenders of Wildlife v. Salazar, 729 F. Supp. 2d 1207, 1212 (D. Mont. 2010) (citation omitted).  By the 1930s, wolves had been completely exterminated throughout Idaho, Montana, Wyoming, and adjacent portions of southwestern Canada.  Id.

Since then, federal policy regarding gray wolves has evolved considerably. Gray wolves were among the first species to receive federal protection under the Endangered Species Act, 16 U.S.C. § 1531, et seq., following its enactment in 1973.  And in an effort to reverse the widespread eradication of gray wolves and restore natural ecological balance, the federal government initiated a program in 1995 to reintroduce wolves to appropriate habitats in the Northern Rockies region, including the Frank Church Wilderness.  ER 139.

Since the reintroduction, the Service has explicitly advocated "the importance of wolf recovery to enhancement of wilderness character" in the Frank Church Wilderness.  Wolf Recovery Found. v. U.S. Forest Serv., 692 F. Supp. 2d 1264, 1266 (D. Idaho 2010) (quoting Forest Service decision memorandum). Citing wolves' importance to wilderness character, in 2010 the Service

10

successfully defended its decision to allow IDFG to dart and collar wolves from helicopters in the Frank Church Wilderness in an effort to better monitor the population's recovery; the Idaho district court held that man's attempt "to restore the wilderness character of the area by returning the wolf" justified the limited use of helicopters for wilderness administration.  Id. at 1268.

The Service's own management plan for the Frank Church Wilderness reflects the importance of native predators such as wolves to maintaining wilderness character, as it permits management interventions that disrupt natural ecological processes only in limited circumstances and subject to specific procedural controls.  The plan contains guidance permitting management actions to address damage by native wildlife, such as wolves, in only three circumstances: "to protect Federally listed threatened or endangered species, to prevent transmission of diseases or parasites affecting other wildlife and humans, or to prevent serious losses of domestic livestock."  ER 221-22.  It also contains a mandatory standard requiring that "[c]ontrol of problem animals will be permitted only on a case-by-case basis in coordination with [IDFG], [the U.S. Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS")]-Wildlife Services and the U.S. Fish and Wildlife Service, and with Regional Forester approval."  ER 142.

## III.  THE WOLF EXTERMINATION PROGRAM

Congress eliminated gray wolves' Endangered Species Act protection in 2011, turning wolf management in Idaho over to IDFG.  See Alliance for the Wild Rockies v. Salazar, 672 F.3d 1170 (9th Cir. 2012) (upholding constitutionality of congressional delisting of wolves).  In 2013, IDFG determined that traditional management of gray wolves through recreational hunting and trapping was not yielding sufficient wolf mortality for the state's purposes.  See ER 287-88 (Letter from IDFG Director to U.S. Forest Serv. Regional Forester).  Specifically, IDFG determined that there were too many wolves preying on elk that might otherwise be available for hunters and commercial outfitters.  Based on that judgment, IDFG decided it would attempt to inflate the elk population by using a professional hunting and trapping program to eliminate entire packs of wolves from the wilderness.  To that end, in mid-December 2013, IDFG dispatched a hired hunter-trapper into the Frank Church Wilderness with instructions to completely eradicate two wolf packs residing entirely within the boundaries of the federal wilderness area—the Golden Creek pack and the Monumental Creek pack.  ER 57, 295.

To carry out its wolf extermination program, IDFG requested the U.S. Forest Service's authorization to use the Service's cabin in the Cabin Creek area of the wilderness as a base of operations for its hunter-trapper, and to access the wilderness via a federal air strip.  ER 289-90.  The record reflects that the relevant

Service officials had full knowledge of IDFG's intent to use these federal facilities to carry out wolf extermination in the wilderness, ER 292-303, 313 (emails between Service officials discussing IDFG's use of federal cabin for wolf extermination), and that IDFG needed access to the Service's cabin to implement its wolf extermination program as planned, see ER 306 (email from Service official explaining that IDFG was unable to carry out the wolf extermination program from state and private facilities). The Service provided the requested authorization to IDFG by email and executed a government housing agreement with IDFG to formalize its authorization for IDFG's use of the federal cabin. ER 289-91 (emails), 304-05 (housing agreement). Further, while the Service's decision is not documented in the record, the federal defendants successfully argued in the district court that the Service granted IDFG's program a waiver from special use permit requirements pursuant to 36 C.F.R. § 251.50(e)(2), which required the Service to make a determination that IDFG's program is regulated by a state agency in a manner adequate to protect National Forest System lands and resources and avoid conflict with National Forest System programs. ER 9-10 (Mem. Decision & Ord.), 74 (Fed. Br.)

The federal defendants do not dispute that the Service failed to consult with other federal agencies, secure the approval of the Regional Forester, or otherwise undertake environmental or legal compliance review before taking steps to assist

13

IDFG's program and allowing its implementation.  Instead, they argued in the district court that the Service's failure to comply with these procedural requirements is permissible because the Service has initiated a post hoc "review" of IDFG's activities and "has not yet made a determination whether the State's program presents management concerns for National Forest System ('NFS') lands and the Frank Church Wilderness."  ER 65.  The Service asserted, and the district court accepted, that this ongoing "review" could substitute for the procedures that governing statutes and regulations mandate before predator control actions may commence in the wilderness, despite the fact that the Service had already authorized the use of its cabin for IDFG's program, granted the program a permit waiver, and allowed IDFG to proceed with unrestricted wolf extermination on national forest wilderness lands.  The Service did not disclose what standards, if any, governed this undefined "review" or whether it would conclude before all the targeted wolves were killed.  Further, the Service did not dispute that it had approved IDFG's use of federal facilities for wolf extermination and allowed IDFG to commence wolf extermination in the wilderness despite the fact that the Service "does not yet have sufficient information to determine if IDFG's activities present management concerns for NFS lands or that the activities are inconsistent with the wilderness values or character of the Frank Church Wilderness."  ER 66.

## IV.   THE DECISION BELOW

On January 17, 2014, the district court denied Appellants' motion for a temporary restraining order and preliminary injunction to temporarily halt IDFG's wolf extermination program during the pendency of this litigation.  ER 1.  The district court's ruling rested on a threshold finding that "there does not appear to be any reviewable final agency action."  ER 7.    This conclusion effectively disposed of Appellants' claims on the merits.  See id. ("[B]ecause there does not appear to be any reviewable final agency action the Court finds the Plaintiffs have not demonstrated a likelihood of success on the merits or any serious questions going to the merits").  Regarding Appellants' claim under the Service's special use permitting regulations, the district court further concluded that the Service properly waived the permit requirement because the challenged wolf extermination program is adequately regulated by a state agency and, in any event, the Service's enforcement of the permit requirement is discretionary.  ER 9-10.  As to Appellants' claims that the Service failed to take specific actions required by the governing land management plan and permitting regulations before wolf control activities commenced in the wilderness, the district court concluded that "the USFS' review and consideration of the IDFG's program appears, at this time, to be a discretionary matter that is not subject to judicial review under the APA."  ER 7. Regarding irreparable harm, the district court found no likelihood of irreparable

15

injury because "the IDFG program for hunting wolves will not result in the loss of the species as a whole." ER 14.

## SUMMARY OF THE ARGUMENT

This Court should reverse the decision below and grant the requested preliminary injunction.

*First*, the district court erred as a matter of law in concluding that Appellants' claims are unreviewable under the Administrative Procedure Act ("APA"). The Service's decisions to (1) grant IDFG a license to use a Forest Service cabin as a base of operations for its wolf extermination program and (2) grant IDFG's program a waiver from special use permitting requirements both are "final agency actions" reviewable under the APA, 5 U.S.C. §§ 704, 706(2)(A). The district court further erred in concluding that it lacked jurisdiction under 5 U.S.C. § 706(1) to compel the Service to undertake interagency coordination and Regional Forester approval procedures mandated by statute, regulation, and the governing forest plan. These procedural requirements are "discrete agency action[s] that [the Service] is required to take," and which may be compelled under § 706(1). Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004) (emphasis in original). See Point II, infra.

*Second*, the district court erred as a matter of law in concluding that Appellants failed to establish a likelihood of success or at least serious legal

questions on the merits of their claims. At the outset, the district court's legally erroneous conclusion that Appellants lack a cause of action under the APA infected its analysis of the merits of each of Appellants' claims, including specifically the district court's rulings that the Forest Service has taken no action requiring compliance with the governing forest plan pursuant to the National Forest Management Act, no action regarding the Wilderness Act, and no major federal action under the National Environmental Policy Act. See Points III.A, B, D, infra. The district court further erred in holding that the Service validly waived the special use permit requirement for IDFG's wolf extermination program pursuant to 36 C.F.R. § 251.50(e)(2) because IDFG's program does not satisfy the conditions for that waiver and, in any event, the Service asserts that it is still conducting a review of IDFG's activities and does not yet have sufficient information to assess the program's eligibility for a waiver under that provision. See Point III.C, infra.

Third, the district court erred as a matter of law in holding that Appellants failed to establish a threat of irreparable harm warranting preliminary injunctive relief because they have not shown that IDFG's wolf extermination program threatens the survival of the entire gray wolf species. The lethal taking of wildlife "is, by definition, irreparable," and Appellants have no obligation to establish a

threat of species-level harm to warrant injunctive relief. <u>Humane Soc'y of U.S. v. Gutierrez</u>, 523 F.3d 990, 991 (9th Cir. 2008). <u>See</u> Point IV, <u>infra</u>.

*Last*, the balance of hardships and public interest tip sharply in favor of the requested injunction, as the Wilderness Act establishes a strong public interest in maintaining pristine wild areas unimpaired by human activity and the defendants-appellees have failed to establish any significant countervailing interest that could justify degrading the wilderness character of the Frank Church Wilderness. <u>See</u> Point V, <u>infra</u>.

Accordingly, this Court should reverse the decision below and issue the requested injunction. <u>See</u> Point VI, <u>infra</u>.

## ARGUMENT

## I.    STANDARD OF REVIEW

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v. Natural Res. Def. Council</u>, 555 U.S. 7, 20 (2008). Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood

18

of irreparable injury and that the injunction is in the public interest." <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1135 (9th Cir. 2011).

This Court reviews for abuse of discretion the district court's order denying Appellant's motion for a preliminary injunction. <u>Shell Offshore</u>, 709 F.3d at 1286. This review is "limited and deferential." <u>Id.</u> (quotation omitted). "'The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law.'" <u>Id.</u> (quoting <u>Sw. Voter Registration Educ. Project v. Shelley</u>, 344 F.3d 914, 918 (9th Cir. 2003) (en banc)). Even where the district court "began with an accurate recitation of the legal standard," its ruling on a preliminary injunction motion will be reversed if its ultimate legal conclusions are erroneous. <u>Earth Island Inst. v. U.S. Forest Serv.</u>, 351 F.3d 1291, 1298 (9th Cir. 2003). Because the district court's preliminary injunction order rested on erroneous legal conclusions and was not an "essentially factual" inquiry, de novo review is proper. <u>See</u> <u>United States v. Hinkson</u>, 585 F.3d 1247, 1259-60 (9th Cir. 2009) (en banc) (under the abuse of discretion standard, where the district court's application of law to facts involved an examination of legal principles and was not an "essentially factual" inquiry, the issue on appeal "should be classified as one of law and reviewed de novo") (quotation omitted).

## II.   APPELLANTS CHALLENGE FINAL AGENCY ACTION AND AGENCY ACTION UNLAWFULLY WITHHELD

The district court made a threshold legal error in ruling that Appellants fail to raise actionable claims under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  "To maintain a cause of action under the APA, a plaintiff must challenge 'agency action' that is 'final.'"  Wild Fish Conservancy v. Jewell, 730 F.3d 791, 800 (9th Cir. 2013) (quoting Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 61-62 (2004)).  Here, Appellants properly challenge final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and further seek to "compel agency action unlawfully withheld," id. § 706(1).  In failing to identify reviewable final agency action under these standards, the district court made a reversible legal error.

### A.   Appellants Challenge Reviewable Final Agency Action

Appellants challenge two final agency actions that are reviewable under § 706(2)(A) of the APA:  (1) the Service's authorization for IDFG to use the Service's cabin as a base of operations for its wolf extermination program, and (2) the Service's decision to waive the special use permit requirement for IDFG's program pursuant to 36 C.F.R. § 251.50(e)(2).  "The APA defines reviewable 'agency action' to include 'the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'"  Wild Fish

Conservancy, 730 F.3d at 800 (quoting 5 U.S.C. § 551(13)).  This expansive

definition is "meant to cover comprehensively every manner in which an agency

may exercise its power."  Whitman v. Am. Trucking Ass'ns, Inc., 531 U.S. 457,

478 (2001).

The Service's express authorization for IDFG to use the Service's cabin as a

base of operations for a wolf extermination program falls squarely within the

APA's definition of reviewable "agency action," as the authorization is a "license"

to use federal facilities.  See 5 U.S.C. § 551(8) (defining "license" to include "the

whole or a part of an agency permit, … approval, … or other form of permission").

In December 2013, IDFG officials requested the Service's permission to use the

federally owned Cabin Creek cabin to house an IDFG employee while he

exterminated wolves within the Frank Church Wilderness.  ER 289-90, 293.  In

response, the Service's District Ranger expressly "authorized" IDFG's employee

"to use the cabin at Cabin Creek for exercising his official duties as an officer of

the State of Idaho."  ER 289.  The Service later formalized this authorization by

executing a government housing agreement with IDFG.  ER 304-05.  As defined in

the APA and common usage, this definitive approval of IDFG's use of the cabin

constitutes a "license," and its issuance is reviewable as "agency action" under the

APA.  5 U.S.C. § 551(13).

The district court erroneously concluded that the Service's approval of IDFG's use of a federal facility is unreviewable because it arose from "day-to-day administrative communications." ER 6. To the extent the district court meant that the license was granted too informally to qualify as agency action under the APA, it erred. The APA does not exempt agency action from judicial review based on its alleged informality. See 5 U.S.C. § 551(13) (defining reviewable "agency action"). Rather, "[i]t is the effect of the action and not its label that must be considered." Or. Natural Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 985 (9th Cir. 2006) (quotation omitted); see also Barrick Goldstrike Mines v. Browner, 215 F.3d 45, 50 (D.C. Cir. 2000) (rejecting argument that EPA pronouncement of the scope of its toxic release inventory was not final agency action because it appeared only in a rulemaking preamble and informal documents). Even if such a limitation on judicial review existed, which it does not, it would not apply here because the Service formalized its authorization in a government housing agreement, ER 304-05—a fact the district court did not address. True, "day-to-day operations" of an agency—such as routine physical operation of a federal facility or the innumerable unspecified activities that constitute an agency's management of a regulatory program—are not reviewable if they are "not fairly analogous to a 'rule, order, license, sanction, [or] relief.'" Wild Fish Conservancy, 730 F.3d at 801 (quoting 5 U.S.C. § 551(13)) (holding that routine practice of opening and closing headgates

at federal hatchery is not "agency action"); see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 899 (1990) (rejecting claim for "general judicial review" of agency's "'land withdrawal review program'" that did not challenge any "identifiable action or event"). But there is no carve-out from the APA's expansive definition of agency action for the explicit grant of a license to use federal facilities simply because the defendant agency labels its activity "administrative."[6]

The district court also erred in concluding that a Memorandum of Understanding ("MOU") regarding reciprocal use of state and federal facilities by the Service and IDFG transforms the Service's authorization into something other than final agency action. See ER 6-7. The MOU provides in relevant part that the Service shall "[r]espond to requests from [IDFG] for use of National Forest improvements [and] facilities." ER 80 (emphasis added). This is in no sense a blanket pre-authorization for IDFG to use the Service's facilities without regard to IDFG's purpose and without specific action from the Service to approve or deny a

---

[6] Though the district court did not address the question, it is equally clear that the Service's authorization for IDFG to use the cabin was "final" under the APA's "pragmatic and flexible" standard. Or. Natural Desert Ass'n, 465 F.3d at 982 (quotation omitted). The authorization was not tentative or interlocutory, but rather a conclusive determination granting IDFG the right to use the Service's cabin for wolf extermination purposes. See Wild Fish Conservancy, 730 F.3d at 801 ("To qualify as 'final,' the action challenged must 'mark the consummation of the agency's decisionmaking process' and 'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'") (quoting Bennett v. Spear, 520 U.S. 154, 177-78 (1997)).

particular request.  To the contrary, the MOU requires that any use of National

Forest facilities by IDFG must be authorized "via the appropriate instrument" and

must "comply with all applicable law."  ER 80, 86.  This language makes clear that

the Service must review each of IDFG's requests, must act on appropriate requests

by issuing an authorization, and retains authority to disapprove of proposed uses

that conflict with governing law.  See Or. Natural Desert Ass'n, 465 F.3d at 982-86

(rejecting Service's argument that annual grazing instructions are not reviewable

agency actions because they merely implement the terms of preexisting permits,

since the instructions contain specific authorizations not provided in the more

general permits).  Further, even if the MOU could fairly be read to authorize

IDFG's use of the cabin under these circumstances, which it cannot, that would not

undermine Appellants' challenge to "specific instances of the Forest Service's

actions taken pursuant to its interpretation of" the MOU.  See Siskiyou Regional

Educ. Project v. U.S. Forest Serv., 565 F.3d 545, 554 (9th Cir. 2009) (rejecting

Service's claim that plaintiffs failed to identify final agency action where plaintiffs

challenged "specific instances of suction dredge mining operations that took place

without an approved plan of operations," which the Service contended were

authorized by the governing forest plan).  The district court's conclusion that the

Service did not take "agency action" in licensing IDFG's use of the cabin, and that

the MOU independently renders that license unreviewable, was legal error

warranting reversal.

Further, the district court entirely failed to consider that the Service's

decision to grant IDFG's wolf extermination program a waiver from special use

permit requirements constitutes final agency action.  As explained more fully

below, the Service violated its own regulations by allowing IDFG's wolf

extermination program to proceed on national forest lands without a special use

permit.  In attempting to justify its action, the Service argued—and the district

court accepted—that no special use permit is required because IDFG's wolf

extermination program is "regulated by a State agency…in a manner that is

adequate to protect National Forest System lands and resources and to avoid

conflict with National Forest System programs or operations."  36 C.F.R. §

251.50(e)(2); ER 9-10 (Mem. Decision & Ord.), 74 (Fed. Br.).  However, 36

C.F.R. § 251.50(e)(2) allows the Service to grant a permit waiver for proposed uses

that are adequately regulated by a state agency only if the authorized Service

official undertakes a "review of a proposal" to use national forest lands and

affirmatively "determines that the proposed use" qualifies for the waiver.  Thus, in

asserting that it properly waived the special use permit requirement pursuant to 36

C.F.R. § 251.50(e)(2), the Service necessarily concedes that it reviewed IDFG's

proposal and rendered a determination that the wolf extermination program

25

qualifies for a permit waiver—agency action that is reviewable under the APA.  5

U.S.C. § 551(13); see Siskiyou Regional Educ. Project, 565 F.3d at 553-54

(holding that Forest Service decisions to exempt certain dredging operations from

requirement to obtain agency approval constituted final agency actions).

### B.     Appellants Challenge Agency Action Unlawfully Withheld

In addition to the affirmative agency actions described above, Appellants

challenge "agency action unlawfully withheld," which this Court may compel

under the APA.  5 U.S.C. § 706(1).  A claim under § 706(1) is proper "where a

plaintiff asserts that an agency failed to take a discrete agency action that it is

required to take."  S. Utah Wilderness Alliance, 542 U.S. at 64 (emphasis in

original) ("SUWA").  In contrast, § 706(1) is not a vehicle for "broad

programmatic attack[s]" on agency administration.  Id.  Appellants here properly

challenge the Service's failure to take discrete actions mandated by its

management plan, which is enforceable by statute, and by agency regulations.  The

district court's scant and erroneous consideration of these claims is grounds for

reversal.

First, Appellants challenge the Service's failure to undertake discrete

interagency coordination and approval procedures mandated by the Frank Church

Wilderness Management Plan before IDFG commenced wolf extermination in the

wilderness.  As described above and discussed more fully below, the Service's

Frank Church Wilderness Management Plan requires that actions to control "problem animals" in the wilderness "will be permitted" only after interagency coordination and Regional Forester approval. ER 142. This mandatory direction is incorporated into management plans for the national forest units encompassing the wilderness area, see ER 102 (Payette Nat'l Forest Plan), and is enforceable under the National Forest Management Act, see 16 U.S.C. § 1604(i) (requiring that "use and occupancy of National Forest System lands shall be consistent with the land management plans"). It is undisputed that the Service failed to conduct the required interagency coordination regarding IDFG's wolf extermination program and did not secure Regional Forester approval of the program.

Second, Appellants challenge the Service's failure to review IDFG's wolf extermination program for consistency with applicable laws, regulations, policies, and the governing forest plan and to impose conditions on the program through a special use permit as necessary to protect wilderness resources and character. These discrete requirements are mandated by the Service's permitting regulations, 36 C.F.R. §§ 251.50, 251.54, and the record in this case reflects no effort by the federal defendants to comply with them.

The district court rejected these claims based on the Service's announcement that it had initiated an undefined "review" of IDFG's program, concluding that this "appears … to be a discretionary matter that is not subject to judicial review under

27

the APA." ER 7; see also ER 12 (district court order stating that Service has not "failed to act" because it "has just begun to review the matter and not yet had an opportunity to make any determination"). As explained above, Appellants challenge the Service's failure to undertake interagency coordination, Regional Forester approval, and permitting procedures before wolf extermination commenced in the wilderness. These requirements are not discretionary, and the Service's initiation of a standardless process to "review" IDFG's program—after IDFG commenced wolf extermination on federal wilderness lands—cannot indefinitely suspend the Service's legal duties nor immunize its failure to undertake mandatory procedures from judicial review.

Further, the procedural requirements Appellants seek to enforce are paradigmatic examples of discrete, mandatory agency action that the Supreme Court has deemed properly subject to judicial compulsion under § 706(1). Each constitutes "'a ministerial or non-discretionary act'" that is part of a mandatory decision-making process. SUWA, 542 U.S. at 64 (quoting Attorney General's

Manual on the Administrative Procedure Act 108 (1947)).[7]  Neither of Appellants'
§ 706(1) claims constitutes the kind of "broad programmatic attack" that the
Supreme Court held unreviewable in SUWA.  Id. at 64.  Importantly, Appellants
do not ask this Court to compel the Service to comply with its broad Wilderness
Act duty to "preserv[e] the wilderness character" of the Frank Church Wilderness,
16 U.S.C. § 1133(b), which is equivalent to the statutory duty that the Supreme
Court deemed beyond the scope of § 706(1) in SUWA, 542 U.S. at 65-67.
Requiring the Forest Service to follow specific, mandatory decision-making
procedures presents no danger of "judicial entanglement in abstract policy
disagreements which courts lack both expertise and information to resolve," nor of
"injecting the judge into day-to-day agency management."  Id. at 66-67.

Insofar as SUWA circumscribed the range of viable claims under § 706(1),
Appellants challenges fall outside the scope of its rule.  First, the SUWA Court
explicitly declined to consider the enforceability of duties imposed by agency
regulation, such as the Forest Service permitting regulations at issue here.  See id.

_____

[7] Moreover, each is the type of procedural decision-making obligation properly
subject to a writ of mandamus for "failure to issue a ruling" under pre-APA
practice.  See SUWA at 63, 66 ("APA carried forward the traditional practice prior
to its passage," including writ of mandamus); see also Safeway Stores, Inc. v.
Brown, 138 F.2d 278, 279-80 (Emerg. Ct. App. 1943) (holding writ of mandamus
available to require agency official, upon receiving protest, to grant or deny
protest, notice it for hearing, or provide opportunity to present further evidence)
(discussed in SUWA, 542 U.S. at 66).

at 72 n.5.  Second, the SUWA Court explained that an agency's land-use plan can

support a claim under § 706(1) "when language in the plan itself creates a

commitment binding on the agency."  Id. at 71; cf. id. at 69 (holding statement in

plan unenforceable "at least absent clear indication of binding commitment in the

terms of the plan").  Here, the Service's decision-making protocol for control of

so-called "problem animals" is articulated in a land management plan "standard."

ER 142.  "Standards" are "management requirements," as opposed to "guidelines"

which are merely "preferred or advisable" measures.  ER 104 (wilderness

management plan) (emphasis added); ER 93 (Payette Nat'l Forest Plan)

("Standards are binding limitations placed on management actions."); see also

Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d 953, 960-64 (9th Cir.

2005) (enforcing forest plan standard under NFMA).[8]  Because the Service's

decision-making procedure for control of "problem animals" is a mandatory

standard, there is "language in the plan itself [that] creates a commitment binding

on the agency," which is enforceable under § 706(1).  SUWA, 542 U.S. at 71.  The

district court erred in its contrary ruling.

---

[8] The wilderness management plan alternatively defines "standards" as
"quantifiable thresholds," ER 104, but that portion of the definition is inapplicable
to the standard governing "[c]ontrol of problem animals," which has no
quantitative component, ER 142.

## III.    APPELLANTS HAVE ESTABLISHED A LIKELIHOOD OF SUCCESS OR SERIOUS LEGAL QUESTIONS ON THE MERITS

The district court's erroneous legal conclusion that the Service has neither taken agency action nor unlawfully failed to act within the meaning of the APA, 5 U.S.C. §§ 706(1), (2)(A), tainted its analysis of the merits of Appellants' claims. See ER 8 (rejecting National Forest Management Act claim because "[t]he action complained of by Plaintiffs is that of IDFG, not the [Service]"), 9 (concluding that "no final agency action has been taken in regards to the Wilderness Act"), 10 (rejecting claim under special use permitting regulations because, inter alia, the Service "has not yet reached a determination regarding the IDFG program…"), 12 (rejecting National Environmental Policy Act claim because "it does not appear that the [Service] has undertaken a 'major federal action'" or "has failed to act"). As explained below, Appellants have demonstrated a likelihood of success, or at least serious legal questions, on the merits of their claims, and the district court's contrary conclusions warrant reversal.

### A.    Appellants Have Established a Likelihood of Success or Serious Legal Questions on the Merits of their National Forest Management Act Claim

The district court erred as a matter of law in concluding that Appellants have not established a likelihood of success or serious legal questions on the merits of their National Forest Management Act claim.  NFMA provides a framework for the Service's management of our national forest lands.  It requires the Service to

31

adopt a comprehensive management plan for each national forest, 16 U.S.C.

§ 1604(a), and prohibits any site-specific activity within a national forest that is

inconsistent with the governing forest plan, id. § 1604(i).  The Service violated this

mandate by authorizing use of a Forest Service cabin for IDFG's wolf

extermination program and granting the program a waiver from permit

requirements without conducting the interagency coordination and Regional

Forester approval procedures mandated by the governing forest plan.  Accordingly,

its authorization and waiver decisions should be set aside.  Id.; 5 U.S.C.

§ 706(2)(A); see also Lands Council v. Powell, 395 F.3d 1019, 1034, 1037 (9th

Cir. 2004) (vacating Service's action where inconsistent with governing forest

plan).  Further, the procedures mandated by the forest plan constitute "discrete

agency action that [the Service] is required to take" under NFMA before

permitting wildlife control actions to proceed in the Frank Church Wilderness, and

which this Court can and should compel under § 706(1) of the APA.  SUWA, 542

U.S. at 64 (emphasis in original); see also Ctr. for Biological Diversity v.

Veneman, 394 F.3d 1108, 1114 (9th Cir. 2005) (observing that plaintiffs could

bring a viable § 706(1) claim by "alleging specific failures of the Forest Service to

consider specific rivers when planning for specific projects" as required by

statute).

The forest plan for the Payette National Forest, which encompasses the Middle Fork area of the Frank Church Wilderness where the Golden Creek and Monumental Creek wolf packs reside, requires the Service to manage the wilderness in compliance with the Frank Church Wilderness Management Plan. ER 102.  As described above, the wilderness management plan prohibits the Service from allowing actions to control "problem animals" within the wilderness unless and until the Service (1) coordinates with IDFG, APHIS-Wildlife Services, and the U.S. Fish and Wildlife Service; and (2) secures approval from the Regional Forester.  ER 142.  The Service flouted these mandates by allowing IDFG to exterminate wolves in the wilderness that IDFG deemed to be preying excessively on wild elk without consulting APHIS or the Fish and Wildlife Service and without Regional Forester approval.  In violating the clear mandate of the wilderness management plan and the forest plan of which it is a part, the Service violated NFMA.  See Lands Council v. McNair, 537 F.3d 981, 989 (9th Cir. 2008) (en banc) (affirming that NFMA prohibits Forest Service action that is inconsistent with the governing forest plan), overruled on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046 (9th Cir. 2009).

The district court erred as a matter of law in holding that "NFMA's consistency requirement does not appear to apply here" because "[t]he action complained of here by plaintiffs is that of IDFG, not the [Service]."  ER 8.  First,

33

NFMA's consistency requirement is not limited to activities directly implemented by the Service; instead, it requires that all "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). Accordingly, where the Service authorizes actions of a third party such as IDFG through any "instrument"—such as the cabin use authorization and permit waiver at issue here—its action must be consistent with the governing forest plan. Here it was not. Further, the relevant wilderness management plan provision speaks of wildlife control actions "permitted" on wilderness lands under the Service's jurisdiction and specifies a decision-making procedure that must be followed before such actions may proceed. ER 142. This language establishes that the Service must take responsibility for reviewing and approving or disapproving all management actions for "[c]ontrol of problem animals" in the Frank Church Wilderness undertaken by <u>any</u> party—not just the Service itself. This reading is reinforced by the Service's wilderness guidance on animal control actions, which makes clear that the Service does not typically implement such actions itself, but rather "shall…[r]ely upon APHIS or the state agencies to…conduct predator control on National Forest System lands." ER 254. Thus, the wilderness management plan's procedural requirements for animal control actions would be

rendered a nullity if read—as the district court did—to apply only to actions directly implemented by the Service.

Given the Service's undisputed failure to comply with applicable management plan provisions, Appellants have established a likelihood of success on their NFMA claim, or, at a minimum, serious questions going to the merits. The district court's contrary conclusion was erroneous and warrants reversal.

### B.    Appellants Have Established a Likelihood of Success or Serious Legal Questions on the Merits of their Wilderness Act Claim

The district court also erred in rejecting Appellants' Wilderness Act claim. Recognizing that "wilderness has value to society that requires conservation and preservation," Congress enacted the Wilderness Act to guarantee an enduring resource of wild lands for future generations. Wilderness Soc'y v. U.S. Fish & Wildlife Serv., 353 F.3d 1051, 1055 (9th Cir. 2003) (en banc). The Act provides for establishment of a National Wilderness Preservation System and sets forth a "broad mandate to protect the forests, waters, and creatures of the wilderness in their natural, untrammeled state." Id. at 1061-62 (emphasis added) (citing 16 U.S.C. § 1131); see also 16 U.S.C. § 1131(c) (defining wilderness as "an area where the earth and its community of life are untrammeled by man," which "retain[s] its primeval character and influence" and "is protected and managed so as to preserve its natural conditions"). While wilderness areas may serve a variety of "recreational, scenic, scientific, educational, conservation, and historical use[s],"

16 U.S.C. § 1133(b), this mandate to preserve wilderness areas and resident wildlife in "their natural, untrammeled state" is dominant: "Although the Act stresses the importance of wilderness areas as places for the public to enjoy, it simultaneously restricts their use in any way that would impair their future use <u>as wilderness</u>." <u>High Sierra Hikers Ass'n v. Blackwell</u>, 390 F.3d 630, 648 (9th Cir. 2004) (emphasis in original).

As the agency charged with managing the Frank Church Wilderness, the Service has an enforceable statutory duty to preserve the area's wilderness character. 16 U.S.C. § 1133(b); <u>High Sierra Hikers</u>, 390 F.3d at 646 ("The agency charged with administering a designated wilderness area is responsible for preserving its wilderness character.") (citing 16 U.S.C. § 1133(b)). Binding regulations implement that duty, requiring the Service to resolve any resource conflicts in wilderness areas in a manner that ensures that "wilderness values will be dominant," unless limited by the Wilderness Act itself or other applicable law. 36 C.F.R. § 293.2(c). The Service must also ensure that, in wilderness, "[n]atural ecological succession will be allowed to operate freely to the extent feasible." <u>Id.</u> § 293.2(a). These mandates prohibit the Service from undertaking, assisting, or authorizing actions—such as the removal of native wolves to inflate elk populations beyond naturally sustained levels—that contravene the statutory

36

mandate to preserve wilderness lands and ecosystems "in their natural condition." 16 U.S.C. § 1131(a); Wilderness Soc'y, 353 F.3d at 1061.

The Service's decisions to authorize the use of its cabin for IDFG's wolf extermination program and to grant the program a waiver from permit requirements turn these mandates on their head. The Service has itself asserted that gray wolves are integral to the wilderness character of the Frank Church Wilderness. See Wolf Recovery Found., 692 F. Supp. 2d at 1266, 1268 (approving Service's management action to promote wolf recovery based on the agency's assertion of "the importance of wolf recovery to enhancement of wilderness character" in the Frank Church Wilderness). Here, however, the Service has approved and assisted actions to systematically eradicate native wolves and manipulate predator-prey relationships for the benefit of recreational and commercial interests. In so doing, the Service has impermissibly "elevated recreational activity over the long-term preservation of the wilderness character of the land," High Sierra Hikers, 390 F.3d at 647, and violated its duty to preserve wilderness character and ensure that ecological processes will be allowed to operate freely, 16 U.S.C. § 1133(b)-(c); 36 C.F.R. § 293.2(a), (c). Because IDFG's wolf extermination effort directly contravenes the Wilderness Act mandate the Service is required to enforce, the Service's decisions to facilitate that effort by licensing IDFG's use of a federal facility and granting its program a waiver from

permit requirements should be set aside.  See Wilderness Soc'y, 353 F.3d at 1064-65 (in reviewing a Wilderness Act claim, the Court asks whether the "purpose and effect" of the challenged activity serve the Act's substantive mandate to preserve wilderness); 5 U.S.C. § 706(2)(A).[9]

The Service also violated the Wilderness Act by failing to undertake the interagency coordination and Regional Forester approval procedures mandated by its wilderness management plan before allowing IDFG's program to proceed. Under the Wilderness Act, the Service has an affirmative duty to protect the wilderness character of the Frank Church Wilderness, 16 U.S.C. § 1133(b); High Sierra Hikers, 390 F.3d at 646, which it implements through its wilderness management plan, see ER 228 (Record of Decision for wilderness mgmt. plan) (identifying Wilderness Act direction for management plan).  Consistent with this statutory duty, the Frank Church Wilderness Management Plan requires the

---

[9]   Though the Wilderness Act grants the Service discretion to resolve resource conflicts where the statute or implementing regulations do not direct a particular outcome, Wilderness Watch v. U.S. Fish and Wildlife Serv., 629 F.3d 1024, 1033-34 (9th Cir. 2010), the Service lacks discretion to subordinate wilderness values in favor of recreational and commercial hunting interests, see High Sierra Hikers, 390 F.3d at 647.  Accordingly, the Service's own guidance for managing the Frank Church Wilderness pursuant to the Wilderness Act does not identify manipulation of game populations as a permissible basis for predator control.  See ER 191 (stating that Regional Forester may approve predator control program in the wilderness only "if necessary to protect federally listed threatened or endangered species, to protect public health and safety, or to prevent serious losses of domestic livestock").

Service to play an affirmative role in approving and regulating control actions directed at native wildlife in the wilderness. See ER 142 (requiring that actions to control "problem animals" in the wilderness "will be permitted only on a case-by-case basis in coordination with [IDFG], APHIS-Wildlife Services and the U.S. Fish and Wildlife Service, and with Regional Forester approval"). The Service's failure to undertake the discrete procedures mandated by the plan adopted to implement its wilderness management duties constitutes "agency action unlawfully withheld" pursuant to 5 U.S.C. § 706(1). See SUWA, 542 U.S. at 64.

The Service's statutory duty to protect wilderness character applies regardless of the states' traditional role in managing wildlife on federal public lands within their borders. See ER 63-64 (Fed. Br.). It is well established that "the 'complete power' that Congress has over public lands necessarily includes the power to regulate and protect the wildlife living there," Kleppe v. New Mexico, 426 U.S. 529, 540-41 (1976) (footnote omitted), and state wildlife management that conflicts with federal objectives for federal public lands is preempted, see Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 854 (9th Cir. 2002) (affirming that "Congress has the authority under the Property Clause to preempt state action" affecting management of federal public lands); see also 43 U.S.C. § 1732(b) (authorizing Secretary of Agriculture to prohibit hunting and fishing in designated areas of national forest lands when necessary to effectively administer such lands

or comply "with provisions of applicable law"). IDFG's wolf extermination program—which is designed to manipulate predator-prey dynamics and artificially inflate game populations—conflicts with the congressional direction to manage the Frank Church Wilderness "so as to preserve its natural conditions" and maintain the wilderness as "an area where the earth and its community of life are untrammeled by man." 16 U.S.C. § 1131(c). IDFG's authority to carry out the program is therefore preempted by the overriding federal objective established in the Wilderness Act.[10]

The district court did not address the merits of Appellants' Wilderness Act claim, erroneously concluding that "no final agency action has been taken in regards to the Wilderness Act." ER 9. Given the patent inconsistency of IDFG's

---

[10] The Wilderness Act's "savings clause" is not to the contrary. That clause provides that nothing in the Wilderness Act "shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish in the national forests." 16 U.S.C. § 1133(d)(7). As this Court has held, such language merely affirms the operation of traditional conflict preemption principles, preserving states' authority to regulate wildlife within their borders except where such regulation conflicts with federal objectives for managing federal lands. See Nat'l Audubon Soc'y, 307 F.3d at 854 (interpreting substantially identical language from savings clause in National Wildlife Refuge System Improvement Act); Wyoming v. United States, 279 F.3d 1214, 1229-35 (10th Cir. 2002) (same). See also Meister v. U.S. Dep't of Agric., 623 F.3d 363, 378-79 (6th Cir. 2010) (rejecting Service's argument that the Wilderness Act's savings clause precluded it from closing wilderness area to hunting authorized under state law). A contrary conclusion that "the [federal government] lacks the power to make a decision regarding the health of wildlife on [federal public lands] when a State, for whatever reason, disagrees with that decision proves too much." Wyoming, 279 F.3d at 1233.

wolf extermination program with the Wilderness Act, implementing regulations, and the Service's guidance interpreting its statutory duties, Appellants have demonstrated a likelihood of success—or at least serious legal questions—on the merits of their claim that the Service's decisions to approve the use of its cabin for IDFG's wolf extermination program and grant the program a waiver from permitting requirements violate the Wilderness Act and should be set aside.  5 U.S.C. § 706(2)(A); see also High Sierra Hikers, 390 F.3d at 648-49 (holding that Service's decision to grant special use permits despite damage to wilderness from overuse was invalid because the decision to authorize additional use "cannot be reconciled with the Forest Service's statutory responsibility" under the Wilderness Act).  Further, it is undisputed that the Service failed to comply with the discrete procedural requirements imposed by the Frank Church Wilderness Management Plan, which requires interagency coordination and Regional Forester approval before actions to control "problem animals" may proceed in the wilderness.  ER 142.  As such, Appellants have demonstrated a likelihood of success—or at least serious legal questions—on the merits of their claim to compel the Service's compliance with these procedures pursuant to 5 U.S.C. § 706(1).

41

### C.    Appellants Have Established a Likelihood of Success or Serious Legal Questions on the Merits of Their Claim Under the Service's Special Use Permitting Regulations

The district court further erred in concluding that Appellants failed to establish a likelihood of success or serious legal questions on the merits of their claim that the Service violated its own regulations by granting IDFG's program a waiver from special use permit requirements.  The Service's decision to waive the permit requirement on the ground that IDFG's wolf extermination program is "regulated by a State agency…in a manner that is adequate to protect National Forest System lands and resources, " 36 C.F.R. § 251.50(e)(2), was arbitrary and unlawful and should be set aside, 5 U.S.C. § 706(2)(A).

Forest Service regulations restrict the activities of third parties in national forests and wilderness areas therein, prohibiting all "special uses" of national forest lands not specifically authorized by a permit from the Service.  36 C.F.R. § 251.50(a).  The special use permit requirement has a broad sweep, as the regulations provide that "[a]ll uses of National Forest System lands, improvements, and resources" constitute "special uses," with the exception of "those authorized by the regulations governing sharing use of roads; grazing and livestock use; the sale and disposal of timber and special forest products…and minerals."  Id. (internal citations omitted).  While a separate provision exempts from the permit requirement "noncommercial recreational activities, such as camping, picnicking,

42

hiking, fishing, boating, hunting, and horseback riding," there is no exemption for non-recreational wildlife management activities such as professional wolf extermination.  Id. § 251.50(c).[11]

Further, the regulations require the Service to screen all proposed special uses of national forest lands and determine whether "[t]he proposed use is consistent with the laws, regulations, orders, and policies establishing or governing National Forest System lands" and "with standards and guidelines in the applicable" forest plan.  Id. § 251.54(e)(1)(i), (ii).  Upon finding that a proposed use does not satisfy these requirements, "the authorized officer shall advise the proponent that the use does not meet the minimum requirements" and no permit may issue.  Id. § 251.54(e)(2) (emphasis added).

Though the record in this case does not document the Service's special use permit determination, the Service successfully argued to the district court that IDFG's "wolf hunting" program is eligible for a permit waiver pursuant to 36 C.F.R. § 251.50(e)(2).  See ER 10 (Mem. Decision & Ord.), 74 (Fed. Br.).  As

---

[11] Accordingly, the federal district court for Oregon held that a state wildlife agency's program to reintroduce mountain goats on national forest lands required a special use permit from the Service.  Friends of the Columbia Gorge v. Elicker, 598 F. Supp. 2d 1136, 1153 (D. Or. 2009), vacated pursuant to settlement agreement, 2011 WL 3205773 (D. Or. July 27, 2011).  Although Friends of the Columbia Gorge was vacated pursuant to a settlement, this Court may still consider it as persuasive authority.  Gherebi v. Bush, 374 F.3d 727, 737 n.14 (9th Cir. 2004).

explained above, that provision allows the Service to waive the permit requirement if it determines, after review of a specific proposal, that the proposed use is "regulated by a State agency or another Federal agency in a manner that is adequate to protect National Forest System lands and resources and to avoid conflict with National Forest System programs or operations." 36 C.F.R. § 251.50(e)(2).

The Service's argument and the district court's conclusion regarding the applicability of section 251.50(e)(2) were erroneous for two reasons. First, the Service's application of this waiver provision was unlawful because, as discussed above in the context of NFMA and the Wilderness Act, IDFG's wolf extermination program will degrade wilderness character and is expressly prohibited by the Service's "policies…governing National Forest System lands" as well as "standards and guidelines in the applicable" forest plan. Id. § 251.54(e)(1)(ii), (e)(2); ER 142, 222 (wilderness management plan). Second, the Service's waiver determination was arbitrary and unlawful because the Service has asserted that it is in fact still "reviewing IDFG's activities and has not yet made a determination whether the State's program presents management concerns for National Forest System…lands and the Frank Church Wilderness." ER 65; see also ER 66 (asserting that "the Forest Service does not yet have sufficient information to determine if IDFG's activities present management concerns for NFS lands or that

the activities are inconsistent with the wilderness values or character of the Frank Church Wilderness").  The Service cannot rationally waive the permit requirement pursuant to 36 C.F.R. § 251.50(e)(2) while asserting that it "does not yet have sufficient information to determine" whether IDFG's program is eligible for a waiver under that provision.  ER 66.  In light of the Service's paradoxical assertion that its review under § 251.50(e)(2) is at once complete and ongoing, as well as the patent conflict between IDFG's wolf extermination program and governing standards and policies for managing the Frank Church Wilderness, the district court erred as a matter of law in concluding that Appellants are unlikely to succeed on their regulatory claim because the Service validly waived the special use permit requirement.  See ER 10.

The district court further erred insofar as it held that the Service has unreviewable discretion to determine whether a special use permit is required and whether a waiver is available.  See ER 10.  The Service's permitting regulations have the force and effect of law and are binding on the agency.  W. Radio Servs. Co. v. Espy, 79 F.3d 896, 900 (9th Cir. 1996); see also Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv., 689 F. Supp. 2d 891, 902-03 (W.D. Ky. 2010) (holding that Service could not bypass special use permitting regulations by authorizing activities through interagency stewardship agreement).  And in applying those regulations, "[t]he Forest Service's discretion is not unbounded."

45

KOLA, Inc. v. United States, 882 F.2d 361, 364 (9th Cir. 1989).  At a minimum, the Service's permitting decisions are reviewable where, as here, they "involve[] an inquiry into whether the proper factors were considered by the…Service."  Id. (internal quotation marks and citation omitted).[12]

Given the manifest inconsistency of IDFG's wolf extermination program with the governing forest plan and wilderness management policies, as well as the Service's assertion that it has not yet determined whether IDFG's program threatens wilderness character and resources, Appellants have established a likelihood of success—or at least serious legal questions—on the merits of their claim that the Service's waiver of special use permit requirements violated binding regulations and should be set aside.  5 U.S.C. § 706(2)(A).[13]

---

[12]  Further, rather than evidencing any exercise of permitting discretion in this case, the administrative record indicates, if anything, that the responsible Service officials misperceived the scope of their regulatory authority.  See ER 292-93 (email exchange between Service officials stating that there is "not much we can do" to prevent IDFG's wolf extermination program and that MOU between the Service and IDFG deprives the Service of authority to regulate the program).

[13] As stated above, the administrative record does not document the Service's waiver determination.  To the extent that the Service failed to screen IDFG's proposal for consistency with applicable laws, regulations, policies, and the governing forest plan, and to deny a permit upon finding that the wolf extermination program is inconsistent with such authorities, it has failed to take "discrete agency action that it is required to take," and which the reviewing court should compel under 5 U.S.C. § 706(1).  SUWA, 542 U.S. at 64 (emphasis in original).

46

### D.    Appellants Have Established a Likelihood of Success or Serious Legal Questions on the Merits of their National Environmental Policy Act Claim

The district court's rejection of Appellants' National Environmental Policy Act claim likewise rested on legal error warranting reversal.  By failing to conduct any environmental analysis to inform its decisions to authorize IDFG's use of a Forest Service cabin for its wolf extermination program and to grant the program a waiver from permit requirements, the Service violated NEPA.

NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  It requires federal agencies to consider potential environmental harm and the means of preventing it in an Environmental Impact Statement ("EIS") before approving "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  To determine whether a proposed federal action will "significantly affect" the environment, the agency may first prepare an environmental assessment, which is a less exhaustive study of the proposed action, its impacts, and alternatives.  40 C.F.R. §§ 1501.4, 1508.9.

The district court erred in concluding that NEPA does not apply because the Service has taken no "major Federal action" regarding IDFG's wolf extermination

47

program.  ER 11-12.[14]  First, the Service's decision to grant IDFG's program a waiver from special use permit requirements is major federal action.  "Major Federal action" under NEPA "includes actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.  This definition embraces "projects and programs entirely or partly…assisted, …regulated, or approved by federal agencies," id. § 1508.18(a), including "actions approved by permit or other regulatory decision as well as…federally assisted activities," id. § 1508.18(b)(4).  The Service's determination that IDFG's program qualifies for a permit waiver under 36 C.F.R. § 251.50(e)(2) presupposes that the program is "potentially subject to Federal control and responsibility," 40 C.F.R. § 1508.18, and represents a "regulatory decision" allowing the program to proceed, id. § 1508.18(b)(4).   For this reason alone, the Service has undertaken major federal action requiring environmental analysis under NEPA.

The Service's authorization for IDFG to use a Forest Service cabin for wolf extermination also constitutes major federal action triggering NEPA.

---

[14]  The Service has not disputed that IDFG's extermination of wolves in the Frank Church Wilderness has significant environmental effects.  See generally ER 71-74 (Fed. Br.); 40 C.F.R. § 1508.27(b)(3), (10) (determination of "significance" under NEPA requires consideration of "[u]nique characteristics of the geographic area such as proximity to…ecologically critical areas" and threatened "violation of Federal…law or requirements imposed for the protection of the environment").

Like the permit waiver, the facility authorization is indisputably "federal." And

whether it is "major" is gauged not only by the direct impact of the action

authorized, i.e., the IDFG employee's occupation of the Service's cabin, but rather

by the consequences of the broader activity facilitated thereby, i.e., the wolf

extermination program. See ER 306 (Service email describing logistical problems

for IDFG to implement wolf extermination program without using Service cabin);

White Tanks Concerned Citizens, Inc. v. Strock, 563 F.3d 1033, 1039-40 (9th Cir.

2009) (holding that, to determine agency's NEPA obligations in conjunction with

issuance of dredge-and-fill permit for private development, the Court considers not

only the environmental impact of filling wetlands subject to federal jurisdiction,

which represented a small percentage of the development's total acreage, but rather

the consequences of the entire development facilitated by the federal permit); Save

Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1122 (9th Cir. 2005) (holding that,

even where agency's permitting authority extended only to waters falling under

federal jurisdiction, "it is the impact of the permit on the environment at large that

determines the [agency's] NEPA responsibility"); see also 40 C.F.R. §§ 1508.8,

1508.18 (requiring consideration of direct and indirect effects in identifying "major

Federal action"). Under these authorities, the Service cannot avoid NEPA by

artificially isolating the use of federal facilities it authorized from the program for which that authorization was sought.[15]

Accordingly, this case is not controlled by <u>Alaska v. Andrus</u>, 591 F.2d 537 (9th Cir. 1979), and <u>Defenders of Wildlife v. Andrus</u>, 627 F.2d 1238 (D.C. Cir. 1980), which both held that the Secretary of Interior's authority to halt a state wolf-killing program on federal lands in Alaska did not itself trigger the obligation to prepare an EIS where federal officials took no "overt act" to facilitate the state program. As the Alaska cases affirmed, an "overt act" by federal officials to

---

[15] The district court erred in relying exclusively on this Court's decision in <u>Rattlesnake Coalition v. EPA</u>, 509 F.3d 1095 (9th Cir. 2007), to conclude that the Service's involvement in IDFG's wolf extermination program is insufficient to trigger NEPA because the Service has not funded the program and does not exercise "any control of the project." ER 10-11. The district court's conclusion that the Service lacks "any control of the project" is erroneous. The Service has necessarily acknowledged its jurisdiction to regulate IDFG's activity by granting the program a waiver from permit requirements and by undertaking an ongoing "review" of the program's consistency with wilderness management directives. Moreover, the Service's wilderness management plan, Wilderness Act guidance, and special use permitting regulations establish the Service's authority and responsibility to regulate wildlife removal actions in the wilderness. The lack of federal funding is not dispositive. <u>See</u> 40 C.F.R. § 1508.18 ("federal actions" under NEPA include "projects and programs entirely or partly financed, <u>assisted</u>, conducted, <u>regulated, or approved by federal agencies</u>") (emphasis added). The extent of federal funding was dispositive in <u>Rattlesnake Coalition</u> because EPA grant funds were the only federal nexus to the challenged project—a sewage treatment plant that the Court acknowledged was otherwise "intrinsically a local matter under the responsibility of local government." 509 F.3d at 1101-02. Here, in contrast, Appellants challenge a program to exterminate native wildlife from federal wilderness lands, using federal facilities, subject to a permit waiver granted by a federal agency.

50

facilitate a state wolf-killing program, including a "license" or "assistance authorization[]," <u>does</u> trigger NEPA duties. <u>Defenders of Wildlife</u>, 627 F.2d at 1245 (quotation omitted). Here, the Service has taken overt action to assist IDFG's wolf extermination program by approving the use of a federal facility as the program's base of operations and by granting the program a waiver from permit requirements. Even setting aside the Service's overt acts, the Alaska cases are further distinguishable because, while the Interior Secretary had discretionary authority to prohibit wolf killing on the federal lands at issue in those cases, he had no mandatory "duty to control nonfederal action." <u>Sierra Club v. Hodel</u>, 848 F.2d 1068, 1091 (10th Cir. 1988) (distinguishing Alaska wolf kill cases), <u>overruled on other grounds by</u> <u>Vill. of Los Ranchos de Albuquerque v. Marsh</u>, 956 F.2d 970 (10th Cir. 1992). In contrast, the governing wilderness management plan and special use permit regulations at issue in this case—which did not apply to the actions of the Secretary of Interior at issue in the Alaska cases—impose mandatory duties on the Service to review and approve or disapprove IDFG's wolf extermination program.

Finally, "[i]t is clear from federal regulations that federal inaction can count as federal action for purposes of triggering the EIS requirement under NEPA." <u>Ramsey v. Kantor</u>, 96 F.3d 434, 445 (9th Cir. 1996). "Major Federal action" includes "the circumstance where the responsible officials fail to act and that

failure to act is reviewable by courts…under the Administrative Procedure Act…as agency action." 40 C.F.R. § 1508.18. Under the Frank Church Wilderness Management Plan and the Service's special use permitting regulations, the Service has a "mandatory obligation to review" IDFG's wolf extermination program and its use of federal facilities for that program. Ramsey, 96 F.3d at 445; see ER 142 (requiring the Service to undertake interagency coordination and secure Regional Forester approval before actions to control "problem animals" may occur in the wilderness); 36 C.F.R. §§ 251.54(e)(1)(i)-(ii) (requiring Service to screen proposed uses of national forest lands for consistency with applicable laws and policies and to refuse a permit for proposed uses that are inconsistent with these authorities). These mandatory obligations to review IDFG's wolf extermination program "suffice[] to make [the agency's] failure to disapprove major federal action under 40 C.F.R. § 1508.18." Ramsey, 96 F.3d at 445. The district court rejected this argument on the ground that the Service "has neither approved nor disapproved the IDFG activities in the Frank Church Wilderness." ER 12 (footnote omitted). This was in error. As this Court held in Ramsey, the agency's "failure to disapprove" the challenged activity constitutes major federal action where, as here, the agency has a mandatory review obligation. 96 F.3d at 445 (emphasis added). Further, the Service has approved IDFG's "wolf hunting" program by granting it a waiver from

the special use permit requirement under 36 C.F.R. § 251.50(e)(2). ER 74 (Fed.

Br.).

At a minimum, the Service's failure to conduct any environmental review of its decisions to approve the use of a Forest Service cabin for IDFG's wolf extermination program and to grant the program a waiver from permit requirements, as well as its failure to disapprove the program in discharging its mandatory review obligations, raise serious legal questions on the merits of Appellants' NEPA claim. The district court's contrary ruling should be reversed.

## IV. THE DISTRICT COURT ERRED AS A MATTER OF LAW IN HOLDING THAT APPELLANTS MUST DEMONSTRATE A THREAT TO THE ENTIRE GRAY WOLF SPECIES TO ESTABLISH A LIKELIHOOD OF IRREPARABLE HARM

The district court applied an erroneous legal standard in rejecting Appellants' claim that IDFG's extermination of gray wolves threatens irreparable injury to the wilderness character of the Frank Church Wilderness and Appellants' documented interest therein. The district court held that Appellants had not demonstrated a threat of irreparable harm warranting a preliminary injunction because "the IDFG program for hunting wolves will not result in the loss of the species as a whole." ER 14. The district court's invocation of a legal standard requiring Appellants to show that the challenged action will eradicate the gray wolf species from the face of the Earth before injunctive relief may be warranted defies this Court's precedent and should be reversed.

53

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987). Consistent with this principle, this Court has held in circumstances similar to this case that the lethal taking of wildlife "is, by definition, irreparable." Humane Soc'y of U.S. v. Gutierrez, 523 F.3d 990, 991 (9th Cir. 2008) (reversing denial of preliminary injunction pending appeal to halt federally approved program involving lethal removal of a limited number of California sea lions in an effort to reduce predation on salmon). Accordingly, a plaintiff seeking a preliminary injunction to suspend lethal wildlife removal need not establish a threat to the survival of the entire species before irreparable harm is established. See id.; see also Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1256-58 (10th Cir. 2003) (reversing denial of preliminary injunction on ground that district court erroneously required plaintiffs to show damage to an entire species to establish likelihood of irreparable harm). On the contrary, in the specific context of injury to wildlife within a federal wilderness area, this Court has held that injunctive relief is warranted upon finding that "environmental injury to…wilderness areas is 'likely'" due to "a reduction in the population"—not the outright extinction—"of sensitive species." High Sierra Hikers, 390 F.3d at 642 (emphasis added).

This Court's irreparable harm standard is satisfied here.  Appellants have documented their interest in the wilderness character of the Frank Church Wilderness—including the Middle Fork area and the wolves constituting the Golden Creek and Monumental Creek wolf packs.  See ER 19-49 (Appellants' declarations).  Further, the Service itself has recognized the significance of wolves to the area's wilderness character.  See Wolf Recovery Found., 692 F. Supp. 2d at 1266 (citing Service's assertion of "the importance of wolf recovery to enhancement of wilderness character" in the Frank Church Wilderness).  IDFG's program to exterminate wolves through professional trapping and hunting has already inflicted a significant toll on the Golden Creek and Monumental Creek packs and, correspondingly, the wilderness character of the Frank Church Wilderness, and the agency has made clear its intention to resume and expand the program in the Middle Fork region.  ER 281; IDFG Predation Mgmt. Plan 10-11, supra n.3.  Once the targeted wolves are killed, no court order can restore them or the wilderness character degraded by their loss.  By nevertheless requiring proof that IDFG's program threatens the survival of the gray wolf species as a whole to establish irreparable harm, the district court applied an erroneous legal standard warranting reversal.

## V.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST SUPPORT PRELIMINARY INJUNCTIVE RELIEF

Though the district court did not consider the remaining preliminary injunction factors, see ER 13-14, the balance of hardships and public interest tip sharply in favor of the requested injunction.  Where a threat of environmental injury is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment."  Village of Gambell, 480 U.S. at 545.  Further, there is no evidence that a preliminary injunction will significantly harm the interests of the defendants-appellees.  Humane Soc'y, 523 F.3d at 991.  Though IDFG's goal in exterminating the Golden Creek and Monumental Creek wolf packs is to inflate elk numbers to enhance hunting opportunities, IDFG's own data show that the Middle Fork region of the Frank Church Wilderness hosts some of the lowest elk hunter densities in the state and continues to support a population of more than 4,200 elk.  ER 273, 280.  The limited number of hunters affected by IDFG's perceived elk shortfall diminishes the weight of its asserted interest.  More fundamentally, a temporary suspension of IDFG's wolf extermination program pending final judgment on the merits will not irreparably harm the interests of IDFG and any affected hunters, as the wolf extermination program may resume if Appellants do not prevail.  See Kootenai Tribe v. Veneman, 313 F.3d 1094, 1125 (9th Cir. 2002) (affirming that "restrictions on human intervention are not usually irreparable in the sense required for injunctive relief"; "Unlike the resource

destruction that attends development, and that is bound to have permanent repercussions, restrictions on forest development and human intervention can be removed if later proved to be more harmful than helpful."), abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv., 630 F.3d 1173 (9th Cir. 2011) (en banc).

As to the public interest, this Court's analysis in High Sierra Hikers is controlling here:

> Congress has recognized through passage of the Wilderness Act that there is a strong public interest in maintaining pristine wild areas unimpaired by man for future use and enjoyment.  Because Congress has recognized the public interest in maintaining these wilderness areas largely unimpaired by human activity, the public interest weighs in favor of equitable relief.

390 F.3d at 643 (internal citation omitted).

## VI.  THIS COURT SHOULD ISSUE THE REQUESTED INJUNCTION

To prevent irreparable harm to Appellants' interests and the wilderness character of the Frank Church Wilderness, this Court should reverse the decision below and enjoin the Forest Service and IDFG Director Moore from further authorizing, facilitating, or conducting any wolf extermination activities in the Frank Church Wilderness pending final judgment on the merits of Appellants' claims.  In this regard, IDFG Director Moore is properly joined as a defendant pursuant to the Federal Rules of Civil Procedure to effectuate complete relief and to avoid imposition of inconsistent obligations.  See Nat'l Wildlife Fed'n v. Espy,

45 F.3d 1337, 1344-45 (9th Cir. 1995) (holding that purchasers of property were properly joined under Rule 19 in an action challenging property transfer by federal agencies); League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency, 558 F.2d 914, 917-18 (9th Cir. 1977) (holding that permissive joinder of developers who received challenged agency approvals was proper).[16]

Further, this Court may enjoin defendant Moore because such relief is necessary to vindicate federal rights afforded by federal law. See S. Carolina Wildlife Fed'n v. Limehouse, 549 F.3d 324, 330 (4th Cir. 2008) ("[F]ederal courts have a form of pendent jurisdiction based upon necessity over claims for injunctive relief brought against state actors in order to preserve the integrity of federal remedies.") (quotations, alteration, and citation omitted); see also Fund for Animals v. Lujan, 962 F.2d 1391, 1397 (9th Cir. 1992) ("Nonfederal actors may … be enjoined under NEPA if their proposed action cannot proceed without the prior approval of a federal agency."); Citizens for Smart Growth v. Sec'y of Transp., 669 F.3d 1203, 1210 (11th Cir. 2012); S.W. Williamson Cnty. Cmty. Ass'n v. Slater, 243 F.3d 270, 277 (6th Cir. 2001) (same); Sierra Club, 848 F.2d at 1096-97 (affirming injunction prohibiting county from continuing road construction

---

[16] The Eleventh Amendment poses no bar to defendant Moore's joinder. See Ex parte Young, 209 U.S. at 123, 159-60 (holding that private individuals may sue state officials for prospective injunctive relief against ongoing violations of federal law); Nat'l Audubon Soc'y, 307 F.3d at 847 (same).

bordering a wilderness study area pending federal action to protect wilderness character).[17]

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court reverse the district court's order and issue a preliminary injunction prohibiting the Forest Service and IDFG from further authorizing, facilitating, or conducting any wolf extermination program or activities in the Frank Church Wilderness pending final judgment on the merits of this case.

Respectfully submitted this 14th day of February, 2014.


　　　s/ Timothy J. Preso
Timothy J. Preso
Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Appellants*

---

[17] No injunction bond, or only a nominal bond, should be required in this public-interest case.  See California ex rel. Van De Kamp v. Tahoe Regional Planning Agency, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (requiring no bond); Friends of the Earth v. Brinegar, 518 F.2d 322, 323 (9th Cir. 1975) (reversing the district court's unreasonably high bond because it served to thwart citizen actions).

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,894 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman.

Dated:  February 14, 2014

s/ Timothy J. Preso

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, plaintiffs-appellants Ralph Maughan, et al., hereby certify that there are no known related cases pending in this Court.


     s/ Timothy J. Preso

**STATUTORY AND REGULATORY ADDENDUM**

## Table of Contents

1.  16 U.S.C. § 1131...................................................................................1

2.  16 U.S.C. § 1133...................................................................................2

3.  16 U.S.C. § 1604...................................................................................6

4.  42 U.S.C. § 4332.................................................................................13

5.  43 U.S.C. § 1732(b)...........................................................................15

6.  36 C.F.R. § 251.50.............................................................................16

7.  36 C.F.R. § 251.54(e) ........................................................................18

8.  36 C.F.R. § 293.2...............................................................................21

9.  40 C.F.R. § 1500.1.............................................................................22

10. 40 C.F.R. § 1501.4.............................................................................22

11. 40 C.F.R. § 1508.8.............................................................................23

12. 40 C.F.R. § 1508.9.............................................................................24

13. 40 C.F.R. § 1508.18...........................................................................24

14. 40 C.F.R. § 1508.27...........................................................................25

15. Central Idaho Wilderness Act of 1980, P.L. 96-312, 94 Stat. 948,
    96th Cong. (1980)...............................................................................27

## 16 U.S.C. § 1131
## National Wilderness Preservation System

(a) Establishment; Congressional declaration of policy; wilderness areas; administration for public use and enjoyment, protection, preservation, and gathering and dissemination of information; provisions for designation as wilderness areas.

In order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition, it is hereby declared to be the policy of the Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness. For this purpose there is hereby established a National Wilderness Preservation System to be composed of federally owned areas designated by Congress as "wilderness areas", and these shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness; and no Federal lands shall be designated as "wilderness areas" except as provided for in this chapter or by a subsequent Act.

(b) Management of area included in System; appropriations

The inclusion of an area in the National Wilderness Preservation System notwithstanding, the area shall continue to be managed by the Department and agency having jurisdiction thereover immediately before its inclusion in the National Wilderness Preservation System unless otherwise provided by Act of Congress. No appropriation shall be available for the payment of expenses or salaries for the administration of the National Wilderness Preservation System as a separate unit nor shall any appropriations be available for additional personnel stated as being required solely for the purpose of managing or administering areas solely because they are included within the National Wilderness Preservation System.

(c) "Wilderness" defined

1

A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

## 16 U.S.C. § 1133
## Use of wilderness areas

 (a) Purposes of national forests, national park system, and national wildlife refuge system; other provisions applicable to national forests, Superior National Forest, and national park system

The purposes of this chapter are hereby declared to be within and supplemental to the purposes for which national forests and units of the national park and national wildlife refuge systems are established and administered and—

(1) Nothing in this chapter shall be deemed to be in interference with the purpose for which national forests are established as set forth in the Act of June 4, 1897 (30 Stat. 11), and the Multiple-Use Sustained-Yield Act of June 12, 1960 (74 Stat. 215) [16 U.S.C.A. §§ 528-531].

(2) Nothing in this chapter shall modify the restrictions and provisions of the Shipstead-Nolan Act (Public Law 539, Seventy-first Congress, July 10, 1930; 46 Stat. 1020), the Thye-Blatnik Act (Public Law 733, Eightieth Congress, June 22, 1948; 62 Stat. 568), and the Humphrey-Thye-Blatnik-Andresen Act (Public Law 607, Eighty-fourth Congress, June 22, 1956; 70 Stat. 326), as applying to the Superior National Forest or the regulations of the Secretary of Agriculture.

(3) Nothing in this chapter shall modify the statutory authority under which units of the national park system are created. Further, the designation of any area of any park, monument, or other unit of the national park system as a wilderness area

2

pursuant to this chapter shall in no manner lower the standards evolved for the use and preservation of such park, monument, or other unit of the national park system in accordance with sections 1, 2, 3, and 4 of this title, the statutory authority under which the area was created, or any other Act of Congress which might pertain to or affect such area, including, but not limited to, the Act of June 8, 1906 (34 Stat. 225; 16 U.S.C. 432 et seq.); section 3(2) of the Federal Power Act (16 U.S.C. 796(2)); and the Act of August 21, 1935 (49 Stat. 666; 16 U.S.C. 461 et seq.).

(b) Agency responsibility for preservation and administration to preserve wilderness character; public purposes of wilderness areas

Except as otherwise provided in this chapter, each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character. Except as otherwise provided in this chapter, wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use.

(c) Prohibition provisions: commercial enterprise, permanent or temporary roads, mechanical transports, and structures or installations; exceptions: area administration and personal health and safety emergencies

Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

(d) Special provisions

The following special provisions are hereby made:

(1) Aircraft or motorboats; fire, insects, and diseases

Within wilderness areas designated by this chapter the use of aircraft or motorboats, where these uses have already become established, may be permitted to continue subject to such restrictions as the Secretary of Agriculture deems desirable. In addition, such measures may be taken as may be necessary in the control of fire, insects, and diseases, subject to such conditions as the Secretary deems desirable.

(2) Mineral activities, surveys for mineral value

Nothing in this chapter shall prevent within national forest wilderness areas any activity, including prospecting, for the purpose of gathering information about mineral or other resources, if such activity is carried on in a manner compatible with the preservation of the wilderness environment. Furthermore, in accordance with such program as the Secretary of the Interior shall develop and conduct in consultation with the Secretary of Agriculture, such areas shall be surveyed on a planned, recurring basis consistent with the concept of wilderness preservation by the United States Geological Survey and the United States Bureau of Mines to determine the mineral values, if any, that may be present; and the results of such surveys shall be made available to the public and submitted to the President and Congress.

(3) Mining and mineral leasing laws; leases, permits, and licenses; withdrawal of minerals from appropriation and disposition

Notwithstanding any other provisions of this chapter, until midnight December 31, 1983, the United States mining laws and all laws pertaining to mineral leasing shall, to the same extent as applicable prior to September 3, 1964, extend to those national forest lands designated by this chapter as "wilderness areas"; subject, however, to such reasonable regulations governing ingress and egress as may be prescribed by the Secretary of Agriculture consistent with the use of the land for mineral location and development and exploration, drilling, and production, and use of land for transmission lines, waterlines, telephone lines, or facilities necessary in exploring, drilling, producing, mining, and processing operations, including where essential the use of mechanized ground or air equipment and restoration as near as practicable of the surface of the land disturbed in performing prospecting, location, and, in oil and gas leasing, discovery work, exploration, drilling, and production, as soon as they have served their purpose. Mining locations lying within the boundaries of said wilderness areas shall be held and used solely for mining or processing operations and uses reasonably incident thereto; and hereafter, subject to valid existing rights, all patents issued under the

mining laws of the United States affecting national forest lands designated by this chapter as wilderness areas shall convey title to the mineral deposits within the claim, together with the right to cut and use so much of the mature timber therefrom as may be needed in the extraction, removal, and beneficiation of the mineral deposits, if needed timber is not otherwise reasonably available, and if the timber is cut under sound principles of forest management as defined by the national forest rules and regulations, but each such patent shall reserve to the United States all title in or to the surface of the lands and products thereof, and no use of the surface of the claim or the resources therefrom not reasonably required for carrying on mining or prospecting shall be allowed except as otherwise expressly provided in this chapter: Provided, That, unless hereafter specifically authorized, no patent within wilderness areas designated by this chapter shall issue after December 31, 1983, except for the valid claims existing on or before December 31, 1983. Mining claims located after September 3, 1964, within the boundaries of wilderness areas designated by this chapter shall create no rights in excess of those rights which may be patented under the provisions of this subsection. Mineral leases, permits, and licenses covering lands within national forest wilderness areas designated by this chapter shall contain such reasonable stipulations as may be prescribed by the Secretary of Agriculture for the protection of the wilderness character of the land consistent with the use of the land for the purposes for which they are leased, permitted, or licensed. Subject to valid rights then existing, effective January 1, 1984, the minerals in lands designated by this chapter as wilderness areas are withdrawn from all forms of appropriation under the mining laws and from disposition under all laws pertaining to mineral leasing and all amendments thereto.

(4) Water resources, reservoirs, and other facilities; grazing

Within wilderness areas in the national forests designated by this chapter, (1) the President may, within a specific area and in accordance with such regulations as he may deem desirable, authorize prospecting for water resources, the establishment and maintenance of reservoirs, water-conservation works, power projects, transmission lines, and other facilities needed in the public interest, including the road construction and maintenance essential to development and use thereof, upon his determination that such use or uses in the specific area will better serve the interests of the United States and the people thereof than will its denial; and (2) the grazing of livestock, where established prior to September 3, 1964, shall be permitted to continue subject to such reasonable regulations as are deemed necessary by the Secretary of Agriculture.

(5) Commercial services

Commercial services may be performed within the wilderness areas designated by this chapter to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas.

(6) State water laws exemption

Nothing in this chapter shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws.

(7) State jurisdiction of wildlife and fish in national forests

Nothing in this chapter shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish in the national forests.

## 16 U.S.C. § 1604
## National Forest System land and resource management plans

(a) Development, maintenance, and revision by Secretary of Agriculture as part of program; coordination

As a part of the Program provided for by section 1602 of this title, the Secretary of Agriculture shall develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies.

(b) Criteria

In the development and maintenance of land management plans for use on units of the National Forest System, the Secretary shall use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences.

(c) Incorporation of standards and guidelines by Secretary; time of completion; progress reports; existing management plans

The Secretary shall begin to incorporate the standards and guidelines required by this section in plans for units of the National Forest System as soon as practicable after October 22, 1976, and shall attempt to complete such incorporation for all such units by no later than September 30, 1985. The Secretary shall report to the Congress on the progress of such incorporation in the annual report required by section 1606(c) of this title. Until such time as a unit of the National Forest System is managed under plans developed in accordance with this subchapter, the management of such unit may continue under existing land and resource management plans.

(d) Public participation in management plans; availability of plans; public meetings

The Secretary shall provide for public participation in the development, review, and revision of land management plans including, but not limited to, making the plans or revisions available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption, during which period the Secretary shall publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plans or revisions.

(e) Required assurances

In developing, maintaining, and revising plans for units of the National Forest System pursuant to this section, the Secretary shall assure that such plans—

(1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 [16 U.S.C.A. §§ 528-531], and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

(2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1) of this section, the definition of the terms "multiple use" and "sustained yield" as provided in the Multiple-Use Sustained-Yield Act of 1960, and the availability of lands and their suitability for resource management.

(f) Required provisions

Plans developed in accordance with this section shall—

7

(1) form one integrated plan for each unit of the National Forest System, incorporating in one document or one set of documents, available to the public at convenient locations, all of the features required by this section;

(2) be embodied in appropriate written material, including maps and other descriptive documents, reflecting proposed and possible actions, including the planned timber sale program and the proportion of probable methods of timber harvest within the unit necessary to fulfill the plan;

(3) be prepared by an interdisciplinary team. Each team shall prepare its plan based on inventories of the applicable resources of the forest;

(4) be amended in any manner whatsoever after final adoption after public notice, and, if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section; and

(5) be revised (A) from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years, and (B) in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section.

(g) Promulgation of regulations for development and revision of plans; environmental considerations; resource management guidelines; guidelines for land management plans

As soon as practicable, but not later than two years after October 22, 1976, the Secretary shall in accordance with the procedures set forth in section 553 of Title 5, promulgate regulations, under the principles of the Multiple-Use Sustained-Yield Act of 1960 [16 U.S.C.A. §§ 528 to 531], that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to—

(1) specifying procedures to insure that land management plans are prepared in accordance with the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.], including, but not limited to, direction on when and for what plans an environmental impact statement required under section 102(2)(C) of that Act [42 U.S.C.A. § 4332(2)(C)] shall be prepared;

(2) specifying guidelines which—

(A) require the identification of the suitability of lands for resource management;

(B) provide for obtaining inventory data on the various renewable resources, and soil and water, including pertinent maps, graphic material, and explanatory aids; and

(C) provide for methods to identify special conditions or situations involving hazards to the various resources and their relationship to alternative activities;

(3) specifying guidelines for land management plans developed to achieve the goals of the Program which—

(A) insure consideration of the economic and environmental aspects of various systems of renewable resource management, including the related systems of silviculture and protection of forest resources, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish;

(B) provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan;

(C) insure research on and (based on continuous monitoring and assessment in the field) evaluation of the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land;

(D) permit increases in harvest levels based on intensified management practices, such as reforestation, thinning, and tree improvement if (i) such practices justify increasing the harvests in accordance with the Multiple-Use Sustained-Yield Act of 1960, and (ii) such harvest levels are decreased at the end of each planning period if such practices cannot be successfully implemented or funds are not received to permit such practices to continue substantially as planned;

(E) insure that timber will be harvested from National Forest System lands only where—

9

(i) soil, slope, or other watershed conditions will not be irreversibly damaged;

(ii) there is assurance that such lands can be adequately restocked within five years after harvest;

(iii) protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat; and

(iv) the harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber; and

(F) insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an evenaged stand of timber will be used as a cutting method on National Forest System lands only where—

(i) for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan;

(ii) the interdisciplinary review as determined by the Secretary has been completed and the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area;

(iii) cut blocks, patches, or strips are shaped and blended to the extent practicable with the natural terrain;

(iv) there are established according to geographic areas, forest types, or other suitable classifications the maximum size limits for areas to be cut in one harvest operation, including provision to exceed the established limits after appropriate public notice and review by the responsible Forest Service officer one level above the Forest Service officer who normally would approve the harvest proposal:

Provided, That such limits shall not apply to the size of areas harvested as a result of natural catastrophic conditions such as fire, insect and disease attack, or windstorm; and

(v) such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource.

(h) Scientific committee to aid in promulgation of regulations; termination; revision committees; clerical and technical assistance; compensation of committee members

(1) In carrying out the purposes of subsection (g) of this section, the Secretary of Agriculture shall appoint a committee of scientists who are not officers or employees of the Forest Service. The committee shall provide scientific and technical advice and counsel on proposed guidelines and procedures to assure that an effective interdisciplinary approach is proposed and adopted. The committee shall terminate upon promulgation of the regulations, but the Secretary may, from time to time, appoint similar committees when considering revisions of the regulations. The views of the committees shall be included in the public information supplied when the regulations are proposed for adoption.

(2) Clerical and technical assistance, as may be necessary to discharge the duties of the committee, shall be provided from the personnel of the Department of Agriculture.

(3) While attending meetings of the committee, the members shall be entitled to receive compensation at a rate of $100 per diem, including traveltime, and while away from their homes or regular places of business they may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of Title 5, for persons in the Government service employed intermittently.

(i) Consistency of resource plans, permits, contracts, and other instruments with land management plans; revision

Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. Those resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans. When land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

(j) Effective date of land management plans and revisions

Land management plans and revisions shall become effective thirty days after completion of public participation and publication of notification by the Secretary as required under subsection (d) of this section.

(k) Development of land management plans

In developing land management plans pursuant to this subchapter, the Secretary shall identify lands within the management area which are not suited for timber production, considering physical, economic, and other pertinent factors to the extent feasible, as determined by the Secretary, and shall assure that, except for salvage sales or sales necessitated to protect other multiple-use values, no timber harvesting shall occur on such lands for a period of 10 years. Lands once identified as unsuitable for timber production shall continue to be treated for reforestation purposes, particularly with regard to the protection of other multiple-use values. The Secretary shall review his decision to classify these lands as not suited for timber production at least every 10 years and shall return these lands to timber production whenever he determines that conditions have changed so that they have become suitable for timber production.

(l) Program evaluation; process for estimating long-term costs and benefits; summary of data included in annual report

The Secretary shall—

(1) formulate and implement, as soon as practicable, a process for estimating long-terms1 costs and benefits to support the program evaluation requirements of this subchapter. This process shall include requirements to provide information on a representative sample basis of estimated expenditures associated with the reforestation, timber stand improvement, and sale of timber from the National Forest System, and shall provide a comparison of these expenditures to the return to the Government resulting from the sale of timber; and

(2) include a summary of data and findings resulting from these estimates as a part of the annual report required pursuant to section 1606(c) of this title, including an identification on a representative sample basis of those advertised timber sales made below the estimated expenditures for such timber as determined by the above cost process; and

(m) Establishment of standards to ensure culmination of mean annual increment of growth; silvicultural practices; salvage harvesting; exceptions

The Secretary shall establish—

(1) standards to insure that, prior to harvest, stands of trees throughout the National Forest System shall generally have reached the culmination of mean annual increment of growth (calculated on the basis of cubic measurement or other methods of calculation at the discretion of the Secretary): Provided, That these standards shall not preclude the use of sound silvicultural practices, such as thinning or other stand improvement measures: Provided further, That these standards shall not preclude the Secretary from salvage or sanitation harvesting of timber stands which are substantially damaged by fire, windthrow or other catastrophe, or which are in imminent danger from insect or disease attack; and

(2) exceptions to these standards for the harvest of particular species of trees in management units after consideration has been given to the multiple uses of the forest including, but not limited to, recreation, wildlife habitat, and range and after completion of public participation processes utilizing the procedures of subsection (d) of this section.

## 42 U.S.C. § 4332
### Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

13

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

14

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

### 43 U.S.C. § 1732(b)
### Management of use, occupancy, and development of public lands

(b) Easements, permits, etc., for utilization through habitation, cultivation, and development of small trade or manufacturing concerns; applicable statutory requirements

In managing the public lands, the Secretary shall, subject to this Act and other applicable law and under such terms and conditions as are consistent with such law, regulate, through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate, the use, occupancy, and development of the public lands, including, but not limited to, long-term leases to permit individuals to utilize public lands for habitation, cultivation, and the development of small trade or manufacturing concerns: Provided, That unless otherwise provided for by law, the Secretary may permit Federal departments and agencies to use, occupy, and develop public lands only through rights-of-way under section 1767 of this title, withdrawals under section 1714 of this title, and, where the proposed use and development are similar or closely related to the programs of the Secretary for the public lands involved, cooperative agreements under section 1737(b) of this title: Provided further, That nothing in this Act shall be construed as authorizing the Secretary concerned to require Federal permits to hunt and fish on public lands or on lands in the National Forest System and adjacent waters or as enlarging or diminishing the responsibility and authority of the States for management of fish and resident wildlife. However, the Secretary concerned may designate areas of public land and of lands in the National Forest System where, and establish periods when, no hunting or fishing will be permitted for reasons of public safety, administration, or compliance with provisions of applicable law. Except in emergencies, any regulations of the Secretary concerned relating to hunting and fishing pursuant to this section shall be put into effect only after consultation with the appropriate State fish and game department. Nothing in this Act shall modify or change any provision of Federal law relating to migratory birds or to endangered or threatened species. Except as provided in section 1744, section 1782, and subsection (f) of section 1781 of this title and in the last sentence of this paragraph, no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress. In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.

## 36 CFR § 251.50
## Scope

(a) All uses of National Forest System lands, improvements, and resources, except those authorized by the regulations governing sharing use of roads (§ 212.9); grazing and livestock use (part 222); the sale and disposal of timber and special forest products, such as greens, mushrooms, and medicinal plants (part 223); and minerals (part 228) are designated "special uses." Before conducting a special use,

individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer, unless that requirement is waived by paragraphs (c) through (e)(3) of this section.

(b) Nothing in this section prohibits the temporary occupancy of National Forest System lands without a special use authorization when necessary for the protection of life and property in emergencies, if a special use authorization is applied for and obtained at the earliest opportunity, unless waived pursuant to paragraphs (c) through (e)(3) of this section. The authorized officer may, pursuant to § 251.56 of this subpart, impose in that authorization such terms and conditions as are deemed necessary or appropriate and may require changes to the temporary occupancy to conform to those terms and conditions. Those temporarily occupying National Forest System lands without a special use authorization assume liability, and must indemnify the United States, for all injury, loss, or damage arising in connection with the temporary occupancy.

(c) A special use authorization is not required for noncommercial recreational activities, such as camping, picnicking, hiking, fishing, boating, hunting, and horseback riding, or for noncommercial activities involving the expression of views, such as assemblies, meetings, demonstrations, and parades, unless:

(1) The proposed use is a noncommercial group use as defined in § 251.51 of this subpart;

(2) The proposed use is still photography as defined in § 251.51 of this subpart; or

(3) Authorization of that use is required by an order issued under § 261.50 or by a regulation issued under § 261.70 of this chapter.

(d) Travel on any National Forest System road shall comply with all Federal and State laws governing the road to be used and does not require a special use authorization, unless:

(1) The travel is for the purpose of engaging in a noncommercial group use, outfitting or guiding, a recreation event, commercial filming, or still photography, as defined in § 251.51 of this subpart, or for a landowner's ingress or egress across National Forest System lands that requires travel on a National Forest System road that is not authorized for general public use under § 251.110(d) of this part; or

17

(2) Authorization of that use is required by an order issued under § 261.50 or by a regulation issued under § 261.70 of this chapter.

(e) For proposed uses other than a noncommercial group use, a special use authorization is not required if, based upon review of a proposal, the authorized officer determines that the proposed use has one or more of the following characteristics:

(1) The proposed use will have such nominal effects on National Forest System lands, resources, or programs that it is not necessary to establish terms and conditions in a special use authorization to protect National Forest System lands and resources or to avoid conflict with National Forest System programs or operations;

(2) The proposed use is regulated by a State agency or another Federal agency in a manner that is adequate to protect National Forest System lands and resources and to avoid conflict with National Forest System programs or operations; or

(3) The proposed use is not situated in a congressionally designated wilderness area, and is a routine operation or maintenance activity within the scope of a statutory right-of-way for a highway pursuant to R.S. 2477 (43 U.S.C. 932, repealed Oct. 21, 1976) or for a ditch or canal pursuant to R.S. 2339 (43 U.S.C. 661, as amended), or the proposed use is a routine operation or maintenance activity within the express scope of a documented linear right-of-way.

### 36 C.F.R. § 251.54(e)
### Proposal and application requirements and procedures

(e) Pre-application actions.

(1) Initial screening. Upon receipt of a request for any proposed use other than for noncommercial group use, the authorized officer shall screen the proposal to ensure that the use meets the following minimum requirements applicable to all special uses:

(i) The proposed use is consistent with the laws, regulations, orders, and policies establishing or governing National Forest System lands, with other applicable Federal law, and with applicable State and local health and sanitation laws.

(ii) The proposed use is consistent or can be made consistent with standards and guidelines in the applicable forest land and resource management plan prepared under the National Forest Management Act and 36 CFR part 219.

(iii) The proposed use will not pose a serious or substantial risk to public health or safety.

(iv) The proposed use will not create an exclusive or perpetual right of use or occupancy.

(v) The proposed use will not unreasonably conflict or interfere with administrative use by the Forest Service, other scheduled or authorized existing uses of the National Forest System, or use of adjacent non–National Forest System lands.

(vi) The proponent does not have any delinquent debt owed to the Forest Service under terms and conditions of a prior or existing authorization, unless such debt results from a decision on an administrative appeal or from a fee review and the proponent is current with the payment schedule.

(vii) The proposed use does not involve gambling or providing of sexually oriented commercial services, even if permitted under State law.

(viii) The proposed use does not involve military or paramilitary training or exercises by private organizations or individuals, unless such training or exercises are federally funded.

(ix) The proposed use does not involve disposal of solid waste or disposal of radioactive or other hazardous substances.

(2) Results of initial screening. Any proposed use other than a noncommercial group use that does not meet all of the minimum requirements of paragraphs (e)(1)(i)–(ix) of this section shall not receive further evaluation and processing. In such event, the authorized officer shall advise the proponent that the use does not meet the minimum requirements. If the proposal was submitted orally, the authorized officer may respond orally. If the proposal was made in writing, the authorized officer shall notify the proponent in writing that the proposed use does not meet the minimum requirements and shall simultaneously return the request.

(3) Guidance and information to proponents. For proposals for noncommercial group use as well as for those proposals that meet the minimum requirements of

paragraphs (e)(1)(i)–(ix), the authorized officer, to the extent practicable, shall provide the proponent guidance and information on the following:

(i) Possible land use conflicts as identified by review of forest land and resource management plans, landownership records, and other readily available sources;

(ii) Proposal and application procedures and probable time requirements;

(iii) Proponent qualifications;

(iv) Applicable fees, charges, bonding, and/or security requirements;

(v) Necessary associated clearances, permits, and licenses;

(vi) Environmental and management considerations;

(vii) Special conditions; and

(viii) identification of on-the-ground investigations which will require temporary use permits.

(4) Confidentiality. If requested by the proponent, the authorized officer, or other Forest Service official, to the extent reasonable and authorized by law, shall hold confidential any project and program information revealed during pre-application contacts.

(5) Second-level screening of proposed uses. A proposal which passes the initial screening set forth in paragraph (e)(1) and for which the proponent has submitted information as required in paragraph (d)(2)(ii) of this section, proceeds to second-level screening and consideration. In order to complete this screening and consideration, the authorized officer may request such additional information as necessary to obtain a full description of the proposed use and its effects. An authorized officer shall reject any proposal, including a proposal for commercial group uses, if, upon further consideration, the officer determines that:

(i) The proposed use would be inconsistent or incompatible with the purposes for which the lands are managed, or with other uses; or

(ii) The proposed use would not be in the public interest; or

20

(iii) The proponent is not qualified; or

(iv) The proponent does not or cannot demonstrate technical or economic feasibility of the proposed use or the financial or technical capability to undertake the use and to fully comply with the terms and conditions of the authorization; or

(v) There is no person or entity authorized to sign a special use authorization and/or there is no person or entity willing to accept responsibility for adherence to the terms and conditions of the authorization.

(6) NEPA compliance for second-level screening process. A request for a special use authorization that does not meet the criteria established in paragraphs (e)(5)(i) through (e)(5)(v) of this section does not constitute an agency proposal as defined in 40 CFR 1508.23 and, therefore, does not require environmental analysis and documentation.

## 36 C.F.R. § 293.2
## Objectives

Except as otherwise provided in the regulations in this part, National Forest Wilderness shall be so administered as to meet the public purposes of recreational, scenic, scientific, educational, conservation, and historical uses; and it shall also be administered for such other purposes for which it may have been established in such a manner as to preserve and protect its wilderness character. In carrying out such purposes, National Forest Wilderness resources shall be managed to promote, perpetuate, and, where necessary, restore the wilderness character of the land and its specific values of solitude, physical and mental challenge, scientific study, inspiration, and primitive recreation. To that end:

(a) Natural ecological succession will be allowed to operate freely to the extent feasible.

(b) Wilderness will be made available for human use to the optimum extent consistent with the maintenance of primitive conditions.

(c) In resolving conflicts in resource use, wilderness values will be dominant to the extent not limited by the Wilderness Act, subsequent establishing legislation, or the regulations in this part.

# 40 C.F.R. § 1500.1
## Purpose

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork--even excellent paperwork--but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

# 40 C.F.R. § 1501.4
## Whether to prepare an environmental impact statement

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

22

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

(ii) The nature of the proposed action is one without precedent.

## 40 C.F.R. § 1508.8
## Effects

Effects include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

23

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

## 40 C.F.R. § 1508.9
## Environmental assessment

Environmental Assessment:

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

## 40 C.F.R. § 1508.18
## Major Federal action

Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27). Actions include the

circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

### 40 C.F.R. § 1508.27
### Significantly

Significantly as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

## Central Idaho Wilderness Act of 1980
## P.L. 96-312, 94 Stat. 948, 96th Cong. (1980)

An Act to designate certain public lands in central Idaho as the River of No Return Wilderness, to designate a segment of the Salmon River as a component of the National Wild and Scenic Rivers System, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that this Act may be cited as the "Central Idaho Wilderness Act of 1980."

**SEC. 2.** (a) The Congress finds that

(1) certain wildlands in central Idaho lying within the water shed of the Salmon River—the famous "River of No Return"—constitute the largest block of primitive and undeveloped land in the conterminous United States and are of immense national signif icance;

(2) these wildlands and a segment of the Salmon River should be incorporated within the National Wilderness Preservation System and the National Wild and Scenic Rivers System in order to provide statutory protection for the lands and waters and the wilderness-dependent wildlife and the resident and anadromous fish which thrive within this undisturbed ecosystem; and

(3) such protection can be provided without conflicting with established uses.

(b) The purposes of this Act are to—

(1) provide a comprehensive, statutory framework for the protection, administration, and management of the wildlands of the central Idaho region and a portion of the Salmon River through—

27

(A) The designation of the River of No Return Wilderness;

(B) The addition of certain lands in the "Magruder Corridor" to the existing Selway-Bitterroot Wilderness and

(C) The incorporation of one hundred and twenty-five miles of the Salmon River as a component of the National Wild and Scenic Rivers System;

(2) End the controversy over which lands within the central Idaho region will be designated wilderness–thereby assuring that certain adjacent lands better suited for multiple uses other than wilderness will be managed by the Forest Service under existing laws and applicable land management plans and

(3) make a comprehensive land allocation decision for the national forest roadless areas of the central Idaho region.

**SEC. 3**. In furtherance of the purposes of the Wilderness Act of 1064 (78 Stat. 890; 16 U.S.C. 1131), certain lands in the Boise, Challis, Payette, Salmon, Bitterroot, and Nez Perce National Forests, Idaho, situated north and south of the Salmon River which comprise approximately two million two hundred and thirty-nine thousand acres, as generally depicted on a map entitled "River of No Return Wilderness, Proposed", dated June 1980, are hereby designated as wilderness and, therefore, as a component of the National Wilderness Preservation System, and shall be known as the River of No Return Wilderness. The precious classifications of the Idaho and Salmon River Breaks Primitive Areas are hereby abolished.

**SEC. 4.** In furtherance of the purposes of the Wilderness Act, certain lands in the Bitterroot National Forest, Idaho, which comprise approximately one hundred and five thousand six hundred acres as generally depicted on a map entitled "Magruder Corridor Proposed Additions, Selway-Bitterroot Wilderness", dated November 1979, are hereby incorporated in, and shall be deemed to be a par of, the Selway-Bitterroot Wilderness as designated by Public Law 88-77, and, therefore a component of the National Wilderness Preservation System.

**SEC. 5.** (a)(1) Within three years of the date of the date of enactment management this Act, the Secretary of Agriculture (hereinafter referred to as "the plan, submitted Secretary") shall develop and submit to the Committee on Energy and to congressional Natural Resources of the United States Senate and the Committee on committees Interior and Insular Affairs of the House of Representatives a

28

comprehensive wilderness management plan (hereinafter referred to as "the management plan") for the River of No Return Wilderness which shall consider a broad range of land uses and recreation opportunities.

(2) The management plan shall be prepared in coordination with the relevant national forest plans required by section 6 of the National Forest Management Act of 1976 (Public Law 94588).

(3) The management plan shall include the cultural resources management plan required by section 8(a)(3) of this Act.

(4) In preparing the management plan, the Secretary shall provide for full public participation as required under section 6 of the National Forest Management Act.

(5) The management plan shall, among other things, address the need for, and alternative means of, access to the wilderness.

(b) In administering the River of No Return Wilderness, the Secretary shall, to the maximum extent practicable, consistent with the management plan required by this section, clear obstructions from all of the national forest trails within or adjacent to the wilderness on at least an annual basis.

(c) Subject to valid existing rights, the River of No Return Wilderness designated by this Act shall be administered by the Secretary in accordance with the provisions of the Wilderness Act: *Provided*, That any reference in such provisions to the effective date of this Act.

(d)(1) Notwithstanding the provisions of the Wilderness Act of 1964 (78 Stat. 890; 16 U.S.C. 1 131), including section 4(d)(3), closing wilderness areas after December 31, 1983, to the United States mining laws, and the designation of the River of No Return Wilderness by this Act, within that portion of the wilderness depicted on a map entitled "Special Mining Management Zone–Clear Creek", (hereinafter referred to in this section as the "Special Management Zone"), dated June 1980, all prospecting and exploration for, and development or mining of cobalt and associated minerals shall be considered a dominant use of such land and shall be subject to such laws and regulations as are generally applicable to National Forest System lands not designated as wilderness or other special management areas, including such laws and regulations which relate to the right of access to mining claims and private property: *Provided,* That:

29

(A) all mining, locations and associated access roads shall be held and used solely for mining or mineral processing operations and uses reasonably incident thereto, except that the Secretary may permit such access roads to be utilized by the State of Idaho to facilitate the management of the bighorn sheep in the Special Management Zone;

(B) after the date of enactment of this Act, subject to valid existing rights, all patents issued under the mining laws of the United States for claims within the Special Management Zone shall convey title to the mineral deposits within such claims but each such patent shall reserve to the United States all title in or to the surface of the lands and products thereof, and no use of the surface of the claim or the resources therefrom not reasonably required for carrying on mining and prospecting shall be allowed: *Provided,* That the patentee shall have the right to cut and use as much of the mature timber therefrom as may be needed in the extraction, removal and beneficiation of the mineral deposits, if such needed timber is not otherwise reasonably available, and if such timber is cut under sound principles of forest management as defined by National Forest System rules and regulations: *Provided further,* That the patentee shall have the right to use as much of the surface as reasonably necessary for the mining, removal, extraction, or beneficiation of the mineral deposits located therein; and

(C) consistent with the other provisions of this subsection the Secretary may take all reasonable measures to see that the mining or processing of cobalt and associated minerals within the Special Management Zone does not significantly impair the overall habitat of the bighorn sheep located within, or adjacent to, such Zone.

(2) Within three years from the date of enactment of this Act, the Congress. Secretary of Defense, after consultation with the Secretaries of the Interior, Agriculture, Commerce, Transportation, and State and the Federal Emergency Management Agency, shall report to Congress on the strategic significance of the materials and minerals found in the Special Management Zone.

**SEC. 6.** As soon as practicable after enactment of this Act, a map and legal description of the River of No Return Wilderness and a map and legal description of the Selway-Bitterroot Wilderness additions congressional shall be filed with the Committee on Energy and Natural Resources of the United States Senate and the Committee on Interior and Insular Affairs of the United States House of Representatives, and each such map and legal description shall have the same force and effect as if included in this Act: *Provided,* That correction of clerical and

typographical errors in each such legal description and map may be made. Each such map and legal description shall be on file and available for public inspection in the Office of the Chief of the Forest Service, Department of Agriculture.

**SEC. 7.** (a) Within the River of No Return Wilderness and the Selway-Bitterroot Wilderness additions designated by this Act—

(1) the landing of aircraft, where this use has become established prior to the date of enactment of this Act shall be permitted to continue subject to such restrictions as the Secretary deems desirable: *Provided,* That the Secretary shall not permanently close or render unserviceable any aircraft landing, strip in regular use on national forest lands on the date of enactment of this Act for reasons other than extreme danger to (aircraft, and in any case not without the express written concurrence of the agency of the State of Idaho charged with evaluating the safety of backcountry airstrips;

(2) the gazing of livestock were established prior to the date of enactment of this Act shall be permitted to continue subject to such reasonable regula tions as the Secretary deems necessary, as provided in paragraph 4(d)(4) of the Wilderness Act;

(3) commercial services may be performed to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas as provided in paragraph 4(d)(6) of the Wilderness Act; and

(4) the future construction and maintenance of small hydroelectric generators, domestic water facilities, and related facilities shall be permitted in the Threemile and Jersey Creek drainages along the Salmon River upstream from Mackay Bar. (b) As provided in paragraph 4(d)(7) of the Wilderness Act, nothing in this Act shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws.

(c) As provided in paragraph 4(d)(8) of the Wilderness Act, nothing in this Act shall be construed as affecting the jurisdiction or responsibilities of the State of Idaho with respect to wildlife and fish in the national forests in Idaho

**SEC. 8.** (a)(I) In furtherance of the purposes of the Wilderness Act, the Wild and Scenic Rivers Act, section 6 of the National Forest Management Act, the Archaeological Resources Protection Act, and the Historic Preservation Act, the Secretary shall cooperate with the Secretary of the Interior and with agencies

31

institutions of the State of Idaho, in conducting a cultural resource management program within the River of no Return Wilderness and within the Salmon River component of the National Wild and Scenic Rivers System as designated in Section 9 of this Act.

(1) Such program shall have as its purposes the protection of archaeological sites and interpretation of such sites for the public benefit and knowledge insofar as these activities are compatible with the preservation of the values for which the wilderness and wild and scenic river were designated to protect.

(1) To carry out the cultural resource management program required by paragraph (1) of this section, the Secretary shall, as part of the comprehensive management plan required under subsection 5(a) of this Act, develop a cultural resources management plan for the wilderness and the river. Such plan shall—

(A) encourage scientific research into man's past use of the River of No Return Wilderness and the Salmon River corridor;

(B) provide an outline for the protection of significant cultural resources, including protection from vandalism and looting ns well ns destruction from natural deterioration;

(C) be based on adequate inventory data, supplemented by test excavation data where appropriate;

(D) include a public interpretation program; and

(E) comply with all Federal and State historic and cultural preservation statutes, regulations, guidelines, and standards. (b)(l) Within two years from the date of enactment of this Act, the Secretary shall cooperate with the Secretary of the interior and with agencies and institutions of the State of Idaho in conducting an inventory of the ranch, homestead, trapper and other cabins, and structures within the River of No Return Wilderness and within the Salmon River component of the National Wild and Scenic Rivers System designated by section 9 of this Act and submit to the Committee on Energy and Natural Resources of the United States Senate and the Committee on Interior and Insular Affairs of the United States House of Representatives a report on—

(A) the location of these structures;

32

(B) their historic significance, if any,

(C) their present condition

(D) recommendations as to which of these structures should be:

(i) stabilized;

(ii) restored;

(iii) maintained; or

(iv) removed

(E) the estimated cost *of* such stabilization, restoration, maintenance, or removal; and

(F) the suitability of any of these structures for inclusion in the National Register of Historic Places.

(1) Until such time as the study under this subsection is completed and the required report submitted to the Committees, the Secretary shall not knowingly permit the destruction or significant alteration of any historic cabin or other structure on national forest land within the River of No Return Wilderness or the Salmon River component of the National Wild and Scenic Rivers System designated in section 9 of this Act.

**SEC. 9.** (a) The Wild and Scenic Rivers Act (82 Stat. 906, as amended; 16 U.S.C. 1271 et seq.), is further amended as follows: In section 3(a) after paragraph (23) insert the following new paragraph:

"(24)(A) SALMON, IDAHO—The segment of the main river from the mouth of the North Fork of the Salmon River downstream to Long Tom Bar in the following classes:

"(i) the forty-six-mile segment from the mouth of the North Fork of the Salmon River to Corn Creek as a recreational river; and "(ii) the seventy-nine-mile segment from Corn Creek to Long Tom Bar as a wild river; all as generally depicted on a map entitled "Salmon River" dated November 1979, which is on file and available for public inspection in the Office of the Chief, Forest Service, United States Department of Agriculture.

33

"(B) This segment shall be administered by the Secretary of Agriculture: *Provided,* That after consultation with State and localgovernments and the interested public, the Secretary shall take such action as is required by subsection (b) of this section within one year from the date of enactment of this paragraph.

"(C) The use of motorboats (including motorized jetboats) within this segment of the Salmon River shall be permitted to continue at a level not less than the level of use which occurred during calendar year 1978.

"(D) Subject to existing rights of the State of Idaho, including the right of access, with respect to the beds of navigable streams tributaries or rivers, dredge and placer mining in any form including any use of machinery for the removal of sand and gravel for mining purposes shall be prohibited within the segment of the Salmon River designated as a component of the Wild and Scenic Rivers System by this paragraph; within the fifty-three-mile segment of the Salmon River from Hammer Creek downstream to the confluence of the Snake River; and within the Middle Fork of the Salmon River; and its tributary streams in their entirety: *Provided,* That nothing in this paragraph shall be deemed to prohibit the removal of sand and gravel, outside the boundaries of the River of No Return Wilderness or the Gospel-Hump Wilderness, above the high water mark of the Salmon River or the Middle Fork and its tributaries for the purposes of construction or maintenance of public roads: *Provided further,* That this paragraph shall not apply to any written mineral leases approved by the Board of Land Commissioners of the State of Idaho prior to January I, 1980.

"(E) The provisions of section 7(a) of this Act with respect to the licensing of dams, water conduits, reservoirs, powerhouses, transmission lines or other project works, shall apply to the fifty-three-mile segment of the Salmon River from Hammer Creek downstream to the confluence of the Snake River.

"(F) For the purposes of the segment of the Salmon River designed as a component of the Wild and Scenic Rivers System by this paragraph, there is hereby authorized to be appropriated from the Land and Water Conservation Fund, after October 1, 1980, not more than $6,200,000 for the acquisition of lands and interests in lands."

(b) That segment of the main Salmon River designated as a component of the Wild and Scenic Rivers System by this Act, which lies within the River of No Return Wilderness or the Gospel-Hump Wilderness designated by Public Law 95-237, shall be managed under the provisions of the Wild and Scenic Rivers Act, as

34

amended, and the regulations promulgated pursuant thereto, notwithstanding section 10(b) of the note. Wild and Scenic Rivers Act or any provisions of the Wilderness Act to the contrary.

**SEC. 10.** (a) Notwithstanding any other provision of law, the Secretary shall render, within 30 days from the date of enactment of this Act, a final administrative decision on any and all administrative appeals pending before him or any other official of the Department of Agriculture on the date of enactment of this Act with regard to the following land management plans and corresponding environmental statements (hereinafter referred to in this section as "the plans and environmental statements"):

(1) The Warren Planning Unit Land Management Plan and Final Environmental Statement, Payette National Forest, Idaho, dated May 9, 1979; and

(2) The Landmark Planning Unit Land Management Plan and Final Environmental Statement, Boise National Forest, Idaho, dated May 17, 1979.

(b)(l) Any petition for review of the decision of the Secretary with regard to any of the plans and environmental statements referenced in this section, shall be fled in the United States District Court for the District of Idaho (hereinafter referred to as "the court") within thirty days after the final administrative decision of the Secretary required by this section, or the petition shall be barred. Such court shall have exclusive jurisdiction to determine such proceeding in accordance with standard procedures as supplemented by procedures hereinafter provided and no other district court of the United States shall have jurisdiction over any such challenge in any proceeding instituted prior to, on, or after the date of enactment of this Act.

(2) Notwithstanding any other provision of la\v, the court may set rules governing the procedures of any such proceeding, which set page l limits on briefs and time limits for filing briefs and motions and other actions which are shorter than the limits specified in the Federal Rules of Civil or Appellate Procedure. Appropriation authorization

(3) Any such proceeding before the court shall be assigned for hearing and completed at the earliest possible date, and shall be expedited in every way. The court shall render its final decision relative to any challenge within one hundred and eighty days from the date such challenge is brought unless the court

determines that a longer period of time is required to satisfy the requirements of the United States Constitution.

(C) Any review of any decision of the United States District Court for the District of Idaho shall be made by the Ninth Circuit Court of Appeals of the United States and shall be assigned for hearing and completed at the earliest possible date, and shall be expedited in every possible way.

Approved July 23, 1980.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 14, 2014.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


  __/s/ Timothy J. Preso_____
  Timothy J. Preso