**No. 14-35043**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

RALPH MAUGHAN, DEFENDERS OF WILDLIFE, WESTERN
WATERSHEDS PROJECT, WILDERNESS WATCH,
and CENTER FOR BIOLOGICAL DIVERSITY,

Plaintiffs-Appellants,

v.

TOM VILSACK, U.S. Secretary of Agriculture; TOM TIDWELL, Chief, U.S.
Forest Service; NORA RASURE, Regional Forester of Region Four of the U.S.
Forest Service; KEITH LANNOM, Payette National Forest Supervisor; and
VIRGIL MOORE, Director, Idaho Department of Fish and Game,

Defendants-Appellees.
_____

Appeal from the United States District Court for the District of Idaho
Case No. 4:14-cv-00007-EJL—Hon. Edward J. Lodge, District Judge
_____

### APPELLANTS' REPLY BRIEF

Timothy J. Preso
Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Appellants*

# TABLE OF CONTENTS

I.    APPELLEES FAIL TO UNDERMINE APPELLANTS' NEED FOR RELIEF FROM THIS COURT ..................................................................1

II.   THE SERVICE FAILED TO TAKE MANDATORY ACTION BEFORE IDFG COMMENCED WOLF EXTERMINATION IN THE FRANK CHURCH WILDERNESS .............................................................4

    A.   The Service Failed To Take Action Mandated By The Wilderness Management Plan ...............................................5

    B.   The Service Failed To Take Action Mandated By The Special-Use Permitting Regulations ....................................................8

III.  THE SERVICE UNLAWFULLY FACILITATED IDFG'S WOLF EXTERMINATION EFFORT .......................................................10

    A.   The Service's License For IDFG To Use A Federal Cabin Is Final Agency Action ..............................................................10

    B.   The Service Cannot Escape Its Invocation Of 36 C.F.R. § 251.50(e)(2) .......................................................................13

IV.   ANALYSIS OF THE MERITS FAVORS APPELLANTS' INJUNCTION REQUEST .........................................................16

    A.   National Forest Management Act ...............................................16

    B.   The Wilderness Act ....................................................................18

    C.   Special-Use Permitting Regulations .........................................22

    D.   The National Environmental Policy Act ....................................24

V.    DIRECTOR MOORE'S STATE SOVEREIGNTY ARGUMENTS ARE MERITLESS .............................................................................28

VI.   APPELLANTS HAVE ESTABLISHED IRREPARABLE HARM AND THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR AN INJUNCTION ..........................................................31

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alaska v. Andrus,
    591 F.2d 537 (9th Cir. 1979) ...............................................................26

Alliance for the Wild Rockies v. Cottrell,
    632 F.3d 1127 (9th Cir. 2011) ...........................................................13

Armster v. U.S. District Court,
    806 F.2d 1347 (9th Cir. 1986) ...............................................................6

Continental Illinois Corp. v. CIR,
    998 F.2d 513 (7th Cir. 1993) ..............................................................15

Davis v. Mineta,
    302 F.3d 1104 (10th Cir. 2002) ...........................................................33

Defenders of Wildlife v. Andrus,
    627 F.2d 1238 (D.C. Cir. 1980).........................................................26

Defenders of Wildlife v. Salazar,
    812 F. Supp. 2d 1205 (D. Mont. 2009)...............................................33

Earth Island Inst. v. U.S. Forest Serv.,
    697 F.3d 1010 (9th Cir. 2012) ..................................................... 17-18

Ex Parte Young,
    209 U.S. 123 (1908)...........................................................................28

Forest Guardians v. APHIS,
    309 F.3d 1141 (9th Cir. 2002) ...........................................................19

FTC v. Affordable Media,
    179 F.3d 1228 (9th Cir. 1999) .............................................................6

Fund for Animals v. Frizzell,
    530 F.2d 982 (D.C. Cir. 1975)...........................................................34

Fund for Animals v. Lujan,
    962 F.2d 1391 (9th Cir. 1992) ...........................................................28

Goat Ranchers of Oregon v. Williams,
  379 Fed. App'x 662 (9th Cir. May 19, 2010)....................................................13

Greater Yellowstone Coal. v. Flowers,
  321 F.3d 1250 (10th Cir. 2003) ...................................................................33, 34

Heckler v. Chaney,
  470 U.S. 821 (1985)........................................................................22, 23, 24

High Sierra Hikers Ass'n v. Blackwell,
  390 F.3d 630 (9th Cir. 2004) ............................................................18, 34, 35

Humane Soc'y of U.S. v. Gutierrez,
  523 F.3d 990 (9th Cir. 2008) ........................................................................33

Kleppe v. New Mexico,
  426 U.S. 529 (1976)......................................................................................29

Lujan v. Defenders of Wildlife,
  504 U.S. 555 (1992)......................................................................................32

N. Alaska Envtl. Ctr. v. Lujan,
  961 F.2d 886 (9th Cir. 1992) ........................................................................15

Nat'l Audubon Soc'y v. Davis,
  307 F.3d 835 (9th Cir. 2002) ........................................................................30

Native Ecosystems Council v. U.S. Forest Serv.,
  418 F.3d 953 (9th Cir. 2005) ........................................................................16

New Hampshire v. Maine,
  532 U.S. 742 (2001)................................................................................14, 15

Norton v. S. Utah Wilderness Alliance,
  542 U.S. 55 (2004)......................................................................................4, 7

Pinnacle Armor, Inc. v. United States,
  648 F.3d 708 (9th Cir. 2011) ........................................................................23

Port of Seattle v. FERC,
  499 F.3d 1016 (9th Cir. 2007) ......................................................................22

Ramsey v. Kantor,
    96 F.3d 434 (9th Cir. 1996) ...................................................24, 25, 26

S. Carolina Wildlife Fed'n v. Limehouse,
    549 F.3d 324 (4th Cir. 2008) ...................................................28, 29

Save Our Sonoran, Inc. v. Flowers,
    408 F.3d 1113 (9th Cir. 2005) ...................................................27

Sechrest v. Ignacio,
    549 F.3d 789 (9th Cir. 2008) ...........................................................14

Shaw v. Delta Air Lines, Inc.,
    463 U.S. 85 (1983)..............................................................................28

Sierra Club v. Hodel,
    848 F.2d 1068 (10th Cir. 1988), overruled on other grounds by
    Vill. of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970
    (10th Cir. 1992).................................................................. 26, 28-29

Utah Power & Light Co. v. United States,
    243 U.S. 389 (1917)...........................................................................30

Wetlands Action Network v. U.S. Army Corps of Eng'rs,
    222 F.3d 1105 (9th Cir. 2000), abrogated on other grounds by
    Wilderness Soc'y v. U.S. Forest Serv., 630 F.3d 1173
    (9th Cir. 2011) (en banc)................................................... 26-27

Whaley v. Belleque,
    520 F.3d 997 (9th Cir. 2008) ...........................................................15

White Tanks Concerned Citizens, Inc. v. Strock,
    563 F.3d 1033 (9th Cir. 2009) .........................................................27

Wild Fish Conservancy v. Jewell,
    730 F.3d 791 (9th Cir. 2013) ...........................................................11

Wilderness Watch, Inc. v. U.S. Fish & Wildlife Service,
    629 F.3d 1024 (9th Cir. 2010) .........................................................19

Wolf Recovery Found. v. U.S. Forest Serv.,
    692 F. Supp. 2d 1264 (D. Idaho 2010) .......................................20, 31

<u>Wyoming v. United States</u>,
    279 F.3d 1214 (10th Cir. 2002) .................................................................29, 30

## FEDERAL STATUTES AND REGULATIONS

36 C.F.R.
    § 241.2.................................................................................................*passim*
    § 251.50(a) ...............................................................................................8, 9
    § 251.50(e)(2) ......................................................................................*passim*
    § 251.54(b) ....................................................................................................9
    § 251.54(e) ....................................................................................................8
    § 251.54(e)(1)(i)-(ii) .......................................................................8, 9, 22, 23
    § 251.54(e)(2) ...............................................................................8, 9, 22, 23
    § 293.2(c) ....................................................................................................18

40 C.F.R.
    § 1501.2.......................................................................................................25
    § 1508.18...........................................................................................24, 25, 26

5 U.S.C.
    § 551(13) .....................................................................................................11
    § 701(a)(2) ...................................................................................................23
    § 706(1) ...............................................................................................*passim*
    § 706(2)(A) .............................................................................................10, 13

16 U.S.C.
    § 1131(c) .......................................................................................19, 30, 32, 33
    § 1133(a) .....................................................................................................19
    § 1133(b) .........................................................................................21, 32, 33
    § 1133(c) .....................................................................................................12
    § 1604(i) ........................................................................................................7

The appellees U.S. Forest Service (the "Service") and Idaho Department of Fish and Game ("IDFG") Director Virgil Moore fail to justify the decision below.

## I.     APPELLEES FAIL TO UNDERMINE APPELLANTS' NEED FOR RELIEF FROM THIS COURT

The Appellees attack this Court's jurisdiction, the bases for Appellants' claims, and the propriety of injunctive relief.  Appellants respond to all such arguments infra, but at the outset it is important to address two over-arching points raised by Appellees in an effort to undermine Appellants' need for a preliminary injunction and this Court's authority to grant such relief.

First, the Service insists it has not violated its duty to manage and protect the Frank Church Wilderness because "[t]he action challenged in this lawsuit began and ended before the Service had adequate information to evaluate it."  Fed. Br. 36.  The Service elaborates that it "first learned of IDFG's wolf control plans in mid-December 2013," and promptly took steps to "obtain information from IDFG."  Id. at 36, 46; see also id. at 11, 26.  This assertion is incorrect.  The relevant Service officials learned the details of IDFG's wolf extermination plans on September 17, 2013—nearly three months before IDFG dispatched its hunter-trapper into the wilderness.  See Reply Excerpts of Record ("RER") 6 (agenda for Sept. 17, 2013, Service leadership meeting).  On that date, the Service received a complete draft of IDFG's Middle Fork Elk Management Plan, RER 6, 9, 17, and

1

learned that IDFG's elk and predation management plans would involve professional wolf hunting and trapping in the Middle Fork area of the Frank Church Wilderness designed to inflate the elk population, RER 7, 9, 20.

The Service also learned no later than September 17, 2013, that IDFG intended to use Forest Service facilities for this program; "[t]he use of Cabin Creek"—the federal cabin that the Service authorized IDFG to use as a base for its wolf extermination operation in December 2013—"was specifically discussed" at the September meeting.  RER 16 (District Ranger email).  Indeed, the District Ranger who authorized IDFG's use of the cabin in December 2013 stated that he knew "predator management" was part of IDFG's plan in September 2013 and "knew their request to use our facilities was going to happen sooner than later." ER 293.

Despite knowing in mid-September 2013 that IDFG's wolf-killing program in the Frank Church Wilderness and associated use of the Service's cabin "was going to happen sooner than later," ER 293, the Service made no effort over the ensuing three months to undertake mandatory environmental review and approval procedures that the Service was required to complete before IDFG could conduct wolf extermination in the wilderness.  Accordingly, the Service's contention that

2

IDFG's action "began and ended before the Service had adequate information to evaluate it," Fed. Br. 36, is wrong.[1]

Second, the Service asserts there is neither jurisdiction nor need for this Court's action because the Service is conducting a cooperative evaluation of IDFG's wolf-killing program under 36 C.F.R. § 241.2 and, "well in advance of any control measures that IDFG might plan to take commencing in December 2014, the Regional Forester will make a determination whether IDFG's ten-year plan presents concerns for the Frank Church Wilderness." Fed. Br. 30; see also id. at 16, 27, 31, 33, 39. In addition to its other shortcomings, see Point II, infra, the Service's ongoing "review" does not obviate Appellants' practical need for a preliminary injunction. The Service's nebulous promise of an undefined "determination" appears only in a brief by agency counsel and is unsupported by sworn testimony. The only agency testimony concerning this "review" contains no promise that it will conclude before IDFG resumes wolf extermination. See SER 40-41 (Lannom declaration).

---

[1] The Service notes that IDFG's Predation Management Plan was not published until February 2014, Fed. Br. 12-13, but the Service knew in September 2013 that the plan would involve professional wolf extermination to alter natural predator-prey interactions in the Frank Church Wilderness and use of the Service's facilities. E.g., ER 293. The plan's publication is relevant only to confirm IDFG's intent to resume and sustain wolf extermination in the wilderness and the resulting need for a preliminary injunction. See Appellants' Br. 5-7.

3

Further, agency counsel's statement offers neither a deadline for the promised "determination" nor an assurance that it will be made—and that Appellants will be able to learn of it—in time for Appellants to exhaust a new round of preliminary injunction proceedings in the district court (which would almost certainly be unsuccessful given the ruling presently on appeal) and return to this Court for relief before wolf extermination resumes.  Accordingly, the Service's promised "review" and "determination" does not protect Appellants from the dilemma they faced during the winter of 2013-2014—i.e., commencement of IDFG's wolf-killing activities in the wilderness with no public notice and significant damage to wilderness wolf packs before Appellants can seek even emergency relief from this Court.

## II. THE SERVICE FAILED TO TAKE MANDATORY ACTION BEFORE IDFG COMMENCED WOLF EXTERMINATION IN THE FRANK CHURCH WILDERNESS

In response to Appellants' argument that the Service's binding management plan for the Frank Church Wilderness and special-use permitting regulations prescribe "discrete agency action" that the Service "is required to take," Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004) ("SUWA") (emphasis original), the Service does not dispute that it failed to undertake procedures mandated by these authorities before allowing IDFG's program to proceed in December 2013.  See Fed. Br. 28-31.  Nor does the Service contest that the

procedural requirements Appellants seek to enforce are subject to judicial compulsion under 5 U.S.C. § 706(1). See id. Instead, it claims that § 706(1) relief is unwarranted because "the Service is complying with the regulatory procedures" through its "review" of IDFG's program under 36 C.F.R. § 241.2. Id. at 29. This argument is meritless.

### A.    The Service Failed To Take Action Mandated By The Wilderness Management Plan

The Service's binding management plan for the Frank Church Wilderness prohibits "[c]ontrol of problem animals" unless and until the Service undertakes interagency coordination and secures Regional Forester approval. ER 142; Appellants' Br. 11, 33. The Service's claim that a standardless post-hoc "review" under 36 C.F.R. § 241.2 substitutes for compliance with these discrete, mandatory plan requirements defies both law and logic.

By its terms, 36 C.F.R. § 241.2 does not authorize the Service to "review" state predator control programs nor exempt the Service from compliance with its distinct wilderness management duties. Moreover, while the Service argues that it "is complying with" the wilderness management plan by conducting a "review" under § 241.2, Fed. Br. 29, with its next breath it reveals continuing resistance to complying with the plan by asserting that its "review" will assess "whether" the plan's animal control standard even applies to IDFG's wolf-killing program, id. at

5

30.  Section 241.2 review cannot satisfy the Service's obligations under the wilderness management plan if that review becomes a vehicle for the Service to evade compliance with the plan.

Further, the Service ignores the basic point that a "review" undertaken <u>after</u> IDFG commenced wolf extermination in the wilderness cannot satisfy the wilderness management plan standard mandating discrete procedures <u>before</u> IDFG's wolf-killing program commenced.  <u>See</u> ER 142.  The Service's only nod to this issue is to invoke a mootness defense regarding the events of winter 2013-14, Fed. Br. 30, but the agency's refusal to assure future compliance with the wilderness management plan, <u>see id.</u>, establishes that it is <u>not</u> "absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur," precluding mootness.  <u>FTC v. Affordable Media</u>, 179 F.3d 1228, 1238 (9th Cir. 1999) (quotation omitted); <u>see also</u> <u>Armster v. U.S. District Court</u>, 806 F.2d 1347, 1359 (9th Cir. 1986) ("The bare assertion by the Justice Department in its mootness motion that this situation will not recur" does not moot appeal).

Beyond invoking its insufficient "review" under § 241.2, the Service's only defense is to change the subject by arguing that it has not "unreasonably delayed" compliance with the wilderness management plan within the meaning of 5 U.S.C. § 706(1).  Fed. Br. 28-31.  This argument is irrelevant because Appellants have not raised a claim based on unreasonable delay.  The Service's pending § 241.2 review

6

does not remedy the "agency action unlawfully withheld" that Appellants seek to compel, 5 U.S.C. § 706(1); thus, any "delay" in that review has no bearing on Appellants' claims.

For his part, Director Moore argues that "a statement in an agency management plan cannot form the basis for a claim that the agency failed to take action," citing SUWA.  Moore Br. 27.  This argument is not supported by SUWA, which recognized that a court may enforce an agency's land-use plan under § 706(1) "when language in the plan itself creates a commitment binding on the agency."  542 U.S. at 71.  The Payette National Forest plan, which incorporates the wilderness management plan's predator control standard, states that management plan "[s]tandards are binding limitations placed on management actions," and affirms that "[a] project or action that varies from a relevant standard may not be authorized."  ER 93; accord Fed. Br. 9 (standards are "'management requirements'") (quoting ER 104); 16 U.S.C. § 1604(i) (requiring forest plan compliance).  It is hard to imagine clearer "language in the plan itself [that] creates a commitment binding on the agency" and is judicially enforceable under § 706(1).  SUWA, 542 U.S. at 71.

**B.    The Service Failed To Take Action Mandated By The Special-Use Permitting Regulations**

The Service's special-use permitting regulations required it to review IDFG's proposed wolf extermination program and determine whether the program "is consistent with the laws, regulations, orders, and policies establishing or governing National Forest System lands [and] with other applicable Federal law" and "standards and guidelines in the applicable forest land and resource management plan."  36 C.F.R. § 251.54(e)(1)(i)-(ii).  The regulations also required the Service to reject IDFG's proposal upon finding it inconsistent with governing law.  Id. § 251.54(e)(2).

The Service defends its failure to take mandatory action under these provisions by asserting that "IDFG did not submit a proposal to the Service for a special use permit."  Fed. Br. 27, 32; accord Moore Br. 20.  This argument misreads the Service's regulations, which do not condition mandatory legal consistency review on the Service's receipt of a proposal explicitly requesting a "special use permit."  Rather, the Service's review obligation is triggered whenever it receives "a request for any proposed use," 36 C.F.R. § 251.54(e) (emphasis added); see also id. § 251.50(a) (defining "special uses").  The Service received at least two requests for a "proposed use" regarding IDFG's wolf extermination program.  First, on September 17, 2013, the Service received a proposal from

8

IDFG "to develop and implement a Predation Management Plan [in the Middle Fork region of the Frank Church Wilderness], including consideration of professional trappers and aerial removal, to address antlerless elk populations that are below objective."  RER 7.  Second, on September 17 and December 10, 2013, the Service received a proposal from IDFG to use a Service cabin as a base for professional wolf extermination in the wilderness.  ER 289-91, RER 16.[2]

Although IDFG did not explicitly request a special-use permit, it proposed "uses of National Forest System lands, improvements, and resources" that are not exempt from permitting requirements by regulation, 36 C.F.R. § 251.50(a), triggering the Service's obligation to screen the "proposed use" and, if screening disclosed conflicts with governing law or forest plan standards, to "advise the proponent that the use does not meet the minimum requirements" for use of national forest lands, id. § 251.54(e)(1)(i)-(ii), (e)(2).  While the regulations may not "impose a mandatory duty on the Service to demand submission of a proposal for a special use permit," Fed. Br. 32 (emphasis omitted), they do impose mandatory duties on the Service to take appropriate action when it receives a proposal to use national forest lands.  The Service failed to do so here, and its failure to act is reviewable under 5 U.S.C. § 706(1).

---

[2] The Service's regulations allow special-use proposals to be "filed in writing … or presented orally."  36 C.F.R. § 251.54(b).

This conclusion is not altered by the Service's invocation yet again of its ongoing "review" under 36 C.F.R. § 241.2. <u>See</u> Fed. Br. 33. Section 241.2 does not supplant the Service's permitting regulations; as the Service acknowledges, "state actions that otherwise would conflict with existing federal provisions" may require a special-use permit regardless of § 241.2. <u>Id.</u> More fundamentally, a post hoc "review" of IDFG's wolf-killing program cannot substitute for timely compliance with permitting requirements that mandated agency action before IDFG's program began.

## III. THE SERVICE UNLAWFULLY FACILITATED IDFG'S WOLF EXTERMINATION EFFORT

To avoid judicial review under 5 U.S.C. § 706(2)(A) of its actions to facilitate IDFG's wolf-killing program, the Service argues that its authorization for IDFG to use a federal cabin as a base of operations is not "final agency action" reviewable under the APA and that the Service never waived the special-use permit requirement. Fed. Br. 20-27. The first argument is foreclosed by the APA and the second by judicial estoppel.

### A. The Service's License For IDFG To Use A Federal Cabin Is Final Agency Action

The Service contends that its authorization for IDFG to use a federal cabin as a base of operations for wolf extermination "merely implements an administrative economizing aspect of an MOU and therefore is not final agency

action." Fed. Br. 23 (citation omitted); accord Moore Br. 18-19.  Such semantics

cannot alter the legal status of the license the Service granted IDFG to use the

cabin—with full knowledge that IDFG intended to conduct professional wolf-

killing in the wilderness.  RER 16.  Such a license constitutes "agency action"

under the plain language of the APA.  5 U.S.C. § 551(13).[3]

Further, this "agency action" was final.  While the Service claims that

Appellants "fail[] to identify any legal consequence that flows from the Service's

approved use of the cabin," Fed. Br. 22 (emphasis original), the obvious legal

consequence was that IDFG was a licensee rather than a trespasser when it used

the cabin for wolf extermination in the Frank Church Wilderness, see ER 289.

The Service also contends that its authorization involved mere

"acquiescence" to IDFG's request pursuant to the parties' MOU and "did not

require or include review of IDFG's wildlife management activities."  Fed. Br. 21;

accord Moore Br. 18-19.  But the MOU does not contemplate passive

"acquiescence" in IDFG's use of federal resources for wildlife management.  See

ER 80 (MOU stating that when the Service grants IDFG's requests to use federal

---

[3] The Service erroneously asserts that, under Appellants' theory, "every shared use
of a pack animal, cabin, or equipment between the Service and IDFG would be
subject to judicial review."  Fed. Br. 22.  As the Court affirmed in Wild Fish
Conservancy v. Jewell, not all agency conduct with physical consequences is
reviewable "final agency action."  730 F.3d 791, 801 (9th Cir. 2013).  Rather, APA
jurisdiction turns on whether the challenged conduct is "fairly analogous to a rule,
order, license, sanction, [or] relief."  Id. (quotation omitted).

11

equipment or services, the Service "shall…collaborate with [IDFG] in project implementation via the appropriate instrument) (capitalization omitted).  Further, under the Service's theory, it would have no choice but to acquiesce in IDFG's use of the cabin even if the state agency intended to operate a commercial enterprise or stage a road-construction project from the cabin—both of which are specifically prohibited in wilderness areas.  16 U.S.C. § 1133(c).  Nothing in the MOU dictates this absurd outcome, as it merely obliges the Service to "[r]espond to requests" from IDFG to use such facilities, ER 80—not to blindly facilitate the state's flouting of the Wilderness Act.  Indeed, the MOU states that it does not affect the participating agencies' legal duties or authorities.  ER 86.

Appellees' contention that "use of the cabin was not critical to IDFG's trapping efforts," Fed. Br. 24; accord Moore Br. 4, 19, defies the record.  At the time of its request, IDFG stated that its hunter-trapper needed the Service's cabin to carry out IDFG's wolf extermination program because conflicting outfitter occupancy prevented his use of other facilities in the Middle Fork area, including the state-owned Mormon Ranch cabin referenced by Director Moore.  See ER 306; Moore Br. 4, 15.  Only after this litigation commenced did the Service and IDFG aver that IDFG's hunter-trapper could have conducted the program without the federal cabin.  See SER 38, 49-50.  Ultimately, the hunter-trapper occupied the Service's cabin for the duration of his wolf extermination activities in the Frank

12

Church Wilderness.  See Gould Decl. (App. Ct. Dkt. 11-2).  At a minimum, the conflict between IDFG's actual reliance on the Service to house its hunter-trapper and contemporaneous statement that the cabin was necessary versus Appellees' self-serving litigation testimony that the cabin was unnecessary creates "serious questions" whether IDFG needed the federal cabin and whether an injunction prohibiting IDFG from using the cabin would halt or limit the state's wolf-killing program.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011).[4]

### B.  The Service Cannot Escape Its Invocation Of 36 C.F.R. § 251.50(e)(2)

The Service's other argument to avoid judicial review under § 706(2)(A) of the APA requires it to disclaim its litigation position in the district court, in contravention of judicial estoppel principles.  When Appellants presented their special-use permitting claim below, the Service, in the district court's words, "counter[ed] that a special use permit is not required under 36 C.F.R. § 251.50(e)(2) in this case because the activity is regulated by a State agency in a

---

[4] Goat Ranchers of Oregon v. Williams, 379 Fed. App'x 662 (9th Cir. May 19, 2010) (cited in Fed. Br. 25 n.8), is inapposite.  Unlike in Goat Ranchers, the record here does not support a finding that "[n]othing that could happen in this case" regarding the cabin authorization "would change" IDFG's wolf-killing program. Id. at 663 (citation omitted); see also id. at 664-65 (Bea, J., dissenting) (finding genuine issue precluding summary judgment regarding whether state agency could kill predators "as effectively and quickly without the assistance" of federal agency).

manner adequate to protect the lands and resources." ER 9 (Mem. Decision & Ord.); see also ER 74 (Service's brief arguing a permit is unnecessary under 36 C.F.R. § 251.50(e)(2) when the proposed use is adequately regulated by the state, and "[h]ere, wolf hunting is regulated by IDFG…."). The district court accepted the Service's argument, concluding that IDFG's activity "may not be subject to a special permit requirement because the IDFG program for managing wolves is a state regulated activity" and citing 36 C.F.R. § 251.50(e)(2). ER 10.

But when confronted with the point that § 251.50(e)(2) requires a waiver determination constituting "final agency action" under the APA, see Appellants' Br. 25-26, the Service reversed course, claiming it "did not determine that IDFG's activities were exempt under 36 C.F.R. § 251.50(e)(2)," Fed. Br. 26. The Service never explains why, if it "plainly" did not waive the permit requirement for IDFG's wolf-killing program under § 251.50(e)(2) as it now claims, id. at 27, it nevertheless cited and quoted § 251.50(e)(2) to the district court, ER 74. Either the Service's argument to the district court was misleading, or its argument to this Court is.

The doctrine of judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quotation omitted); see Sechrest v. Ignacio, 549 F.3d 789, 805 (9th Cir. 2008)

14

(estopping state from presenting appellate argument inconsistent with successful district court argument). The Service's argument that it never determined that IDFG's program qualified for a permit waiver under 36 C.F.R. § 251.50(e)(2) is "clearly inconsistent with its earlier position" invoking that same provision to defeat Appellants' claim. New Hampshire, 532 U.S. at 750 (quotation and citations omitted). Further, the Service "succeeded in persuading a court to accept [its] earlier position," id.; see ER 10, and it "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped," New Hampshire, 532 U.S. at 751 (citations omitted). The Service cannot fairly invoke § 251.50(e)(2) to defeat Appellants' claim in the district court and then disavow reliance on § 251.50(e)(2) to defeat APA jurisdiction on appeal. Accordingly, the Service should be judicially estopped from denying that it took final agency action to waive permitting requirements for IDFG's wolf extermination program under 36 C.F.R. § 251.50(e)(2). See Whaley v. Belleque, 520 F.3d 997, 1002 (9th Cir. 2008) (estopping state from arguing on appeal that habeas corpus petitioner had state-court remedy where state previously argued that petitioner's state-court claim was moot).[5]

---

[5] The Service notes that "the next two sentences" of its district court brief referenced discussions with IDFG and its discretionary enforcement authority. Fed. Br. 41-42 n.11; ER 74. This does not help the Service: "A party can argue inconsistent positions in the alternative, but once it has sold one to the court it cannot turn around and repudiate it in order to have a second victory." Continental

15

## IV.    ANALYSIS OF THE MERITS FAVORS APPELLANTS' INJUNCTION REQUEST

Appellees fail to rebut Appellants' showing of likely success, or at least serious legal questions, on the merits.

### A.    National Forest Management Act

The Service erroneously claims it did not violate NFMA when it failed to undertake interagency coordination and Regional-Forester approval procedures mandated by the wilderness management plan before allowing IDFG to exterminate wolf packs within the Frank Church Wilderness. See Fed. Br. 34-36. The Service first attempts to trivialize the wilderness management plan as an "internal management tool of the agency." Id. at 34. But "[i]t is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d 953, 961 (9th Cir. 2005). The Payette National Forest Plan incorporates the Frank Church Wilderness Management Plan, ER 102, including the standard requiring interagency coordination and Regional-Forester approval before "[c]ontrol of

---

Illinois Corp. v. CIR, 998 F.2d 513, 518 (7th Cir. 1993). Further, "this is not a case where estoppel would compromise a governmental interest in enforcing the law" or frustrate policy change. New Hampshire, 532 U.S. at 755. Thus, there is no reason to soften the judicial estoppel rule for a government defendant. See id.; N. Alaska Envtl. Ctr. v. Lujan, 961 F.2d 886, 891 (9th Cir. 1992) (warning that judicial estoppel would preclude change of position by National Park Service).

16

problem animals" may be "permitted" in the wilderness, ER 142.  The Service's failure to comply with that standard violated NFMA.

The Service next asserts that the plan's Regional-Forester approval requirement applies only "when the Service undertakes an action."  Fed. Br. 34; see also id. at 36 (NFMA's "consistency requirement applies to overt, affirmative actions by the Forest Service") (citations omitted) (emphasis original).  Similarly, Director Moore argues that "it is unreasonable to translate the Plan's language as inherently requiring IDFG to receive permission" from the Service for wolf-killing programs in the Frank Church Wilderness.  Moore Br. 25.  These arguments contradict the standard's plain language, which comprehensively requires Service review and approval of wildlife control actions in the wilderness regardless of what agency implements them.  See ER 142 (plan standard providing that wildlife control actions "will be permitted only on a case-by-case basis" following interagency coordination and Regional-Forester approval) (emphasis added).  This reading reflects the reality that the Service "[r]el[ies] upon APHIS or the state agencies to … conduct predator control on National Forest System lands," ER 254 (Service manual), and is consistent with associated plan standards that prohibit or regulate typical state wildlife management actions such as stocking fish or introducing non-native game species, see ER 141-42.  Such provisions—and their protections for wilderness character—would be nullified if the plan were construed

17

to apply only "when the Service undertakes an action." Fed. Br. 34; <u>Earth Island Inst. v. U.S. Forest Serv.</u>, 697 F.3d 1010, 1013 (9th Cir. 2012) ("The Forest Service is entitled to deference to its interpretation of its own Forest Plans, <u>unless the interpretation is plainly inconsistent with a Forest Plan</u>.") (quotations and alterations omitted, emphasis added).

### B.    The Wilderness Act

The Service argues that the Wilderness Act places no limit on its discretion to permit large-scale wolf extermination in the wilderness for the purpose of inflating game populations because the Act requires it to balance wilderness character with "activities that are expressly allowed in wilderness." Fed. Br. 37. While balancing competing uses is an inherent aspect of land management, the Service fails to acknowledge that, in wilderness areas, Congress has placed a thumb on the scale in favor of wilderness values. "The Forest Service, in resolving potential conflicts in resource use, must find that 'wilderness values will be dominant to the extent not limited by the Wilderness Act.'" <u>High Sierra Hikers Ass'n v. Blackwell</u>, 390 F.3d 630, 646 (9th Cir. 2004) (quoting 36 C.F.R. § 293.2(c)). Accordingly, the Service may not "elevate[] recreational activity over the long-term preservation of the wilderness character of the land." <u>Id.</u> at 647. The Service violated these mandates by facilitating IDFG's program, which seeks systematically to remove resident wolves that the Service has acknowledged are

18

integral to wilderness character to benefit commercial outfitters and recreational hunters.

The Service's suggestion that this Court has generally approved "predator control in wilderness areas," Fed. Br. 37; see also Moore Br. 30, is incorrect. Citing language in the Wilderness Act and Arizona Wilderness Act allowing pre-existing livestock grazing to continue after a wilderness designation, this Court in Forest Guardians v. APHIS agreed with the Service that statutory authorization for "private livestock grazing implicitly includes operations to support that grazing, such as lethal control of predators." 309 F.3d 1141, 1142 (9th Cir. 2002) (quotation omitted). However, IDFG is not exterminating wolves to protect authorized grazing, but rather to benefit commercial outfitters and recreational hunters by killing wolf packs that would prey upon elk under "natural conditions." 16 U.S.C. § 1131(c).[6]

---

[6] While Wilderness Watch, Inc. v. U.S. Fish & Wildlife Service, cited at Fed. Br. 37, observed that the Wilderness Act "does not prohibit" measures to achieve a "reduction in mountain-lion predation" on bighorn sheep, 629 F.3d 1024, 1038 (9th Cir. 2010), it never addressed whether or when lethal predator control is permissible, see id. at 1051 (Bybee, J., dissenting) ("[T]he Service did not recommend killing mountains lions, but studying them…."). Further, the majority's analysis rested on the specific purpose of the affected wildlife refuge and wilderness to conserve and restore bighorn sheep and a Wilderness Act provision specifying that the Act's purposes are "supplemental to the purposes for which … national wildlife refuge systems are established and administered," 16 U.S.C. § 1133(a), neither of which applies here. See Wilderness Watch, 629 F.3d at 1027, 1034-36, 1038.

The Service also contends that "[t]he impact of wolf trapping on 'wilderness character' and 'ecological balance' is nuanced, not plain." Fed. Br. 38. However, the agency has repeatedly interpreted the Wilderness Act to prohibit predator removal in wilderness areas except in three narrow circumstances—to protect threatened or endangered species, prevent transmission of diseases or parasites, and (consistent with Forest Guardians) prevent serious livestock losses—none of which exists here. ER 222, 257 (citing Forest Service Manual (FSM) § 2323.33); see also ER 213 (Service policies provide guidance for "management of fish and wildlife in wilderness in accordance with the Wilderness Act"). Accordingly, the Service itself has categorically precluded wolf killing for the purpose pursued by IDFG.[7]

The Service's observation that "neither hunting nor trapping per se deprive[s] an area of its wilderness character," Fed. Br. 38, does not justify reversal of the agency's established Wilderness Act interpretation. The very purpose of IDFG's wolf-killing program is to reduce the wolf population below levels achievable through recreational hunting and trapping. E.g., ER 287, RER 7. The

---

[7] Director Moore characterizes the reintroduction of wolves as an insult to wilderness character. Moore Br. 30 n.5. This defies not only the Service's interpretation of the Wilderness Act, but also the entire basis for the Idaho district court's application of the Act to allow IDFG's helicopter-assisted wolf-collaring project in the Frank Church Wilderness. See Wolf Recovery Found. v. U.S. Forest Serv., 692 F. Supp. 2d 1264, 1268 (D. Idaho 2010).

20

program is, therefore, <u>per se</u> more intrusive on wilderness character than recreational hunting and trapping. Reflecting this distinction, the Service's own Wilderness Act guidance recognizes that "[a]ngling, hunting, and trapping are legitimate wilderness activities" but approves "[w]ildlife damage control in wilderness" in only the three circumstances specified above. ER 214, 222.

Even if it were correct that the impact of IDFG's wolf extermination program on the wilderness character of the Frank Church Wilderness is "nuanced, not plain," requiring "application of scientific and technical expertise as well as policy considerations," Fed. Br. 38, that is all the more reason why the Service should have undertaken the interagency coordination and Regional-Forester approval procedures mandated by its wilderness management plan before allowing IDFG's program to proceed. The Service does not dispute that it has an enforceable statutory duty to protect the wilderness character of the Frank Church Wilderness, 16 U.S.C. § 1133(b), which it implements through its wilderness management plan, Fed Br. 35; ER 104 (stating that "all wilderness activities will conform to this Management Plan"). Yet the Service offers nothing to address Appellants' argument that its failure to comply with the wilderness management plan violated the Wilderness Act, resting instead on its response to Appellants' NFMA claim. <u>See</u> Fed. Br. 39. Had the Service complied with the plan as the Wilderness Act required, it could have addressed any "nuanced" considerations

21

surrounding IDFG's program <u>before</u> the impacts of that program were inflicted on the wilderness. Its failure to do so violated the Wilderness Act as well as NFMA.

### C.    Special-Use Permitting Regulations

The Service expends most of its argument on the merits of Appellants' special-use permit claim retreating from its position in the district court that IDFG's wolf extermination program is exempt from permit requirements pursuant to 36 C.F.R. § 251.50(e)(2). <u>See</u> Fed. Br. 40-42.[8] Even were the Court to tolerate this about-face—which it should not do, <u>see</u> <u>supra</u> Point III.B—the Service is left to argue that it permissibly failed to review and regulate IDFG's program before wolf-killing commenced, as required by its regulations at 36 C.F.R. § 251.54(e)(1)(i)-(ii), (e)(2), because "the Service's determination regarding what to do about an unpermitted use…is the subject of its discretionary enforcement authority," Fed. Br. 42 (citing <u>Heckler v. Chaney</u>, 470 U.S. 821 (1985)). The Service misreads Appellants' argument and reads <u>Heckler</u> too broadly.

Appellants challenge the Service's violation of binding regulations governing the agency's review of proposals to use national forest lands. <u>See</u> Appellants' Br. 42-43. Appellants do not challenge an agency "decision not to prosecute or enforce, whether through civil or criminal process," which is the

---

[8] Accordingly, the Service offers no answer to Appellants' argument that IDFG's program does not qualify for a permit waiver under § 251.50(e)(2). <u>See</u> Appellants' Br. 44-46.

"narrow" sphere of agency decisions shielded from judicial review under <u>Heckler</u>. <u>Port of Seattle v. FERC</u>, 499 F.3d 1016, 1026-27 (9th Cir. 2007) (quoting <u>Heckler</u>, 470 U.S. at 831). While <u>Heckler</u> may protect the Service's discretion to decide, for example, whether to send a law enforcement officer to eject a trespasser who has not sought authorization to occupy national forest lands, <u>Heckler</u> does not provide the Service "discretion" to disregard its procedural duties to review and act on proposals to use national forest lands as mandated by its regulations.

More fundamentally, <u>Heckler</u>, which interprets § 701(a)(2) of the APA,[9] provides an exception from the "default rule…that agency actions are reviewable" only if the Court cannot discern from relevant statutes, regulations, policies, or judicial decisions a "meaningful standard against which [to] judge the agency's exercise of discretion." <u>Pinnacle Armor, Inc. v. United States</u>, 648 F.3d 708, 718-19 (9th Cir. 2011) (quotations omitted). Here, the regulations require the Service to screen proposed uses for consistency with governing laws and policies and inform the proponent if the use does not conform to these authorities. 36 C.F.R. § 251.54(e)(1)(i)-(ii), (e)(2). The Court can readily judge whether the Service violated these regulations when it elected to "ma[k]e no such determination regarding IDFG's wolf control measures," Fed. Br. 40, before allowing IDFG to

---

[9] Section 701(a)(2) exempts from judicial review "agency action that is committed to agency discretion by law."

commence wolf-killing in the wilderness, see Pinnacle Armor, 648 F.3d at 720 (rejecting government's Heckler argument and clarifying that, "[i]n the rare instance we do find that want of a meaningful standard precludes review, the case typically involves either an agency's power to manage its own docket, or issues where we have neither standards nor expertise, such as when we are asked to review questions of national security….") (internal citations omitted).  Moreover, this Court has already determined that the Service's special-use permit regulations constrain the agency's discretion and has subjected the Service's permitting decisions to judicial review.  See Appellants' Br. 45-46 and cases cited therein. The Service's cursory citation to Heckler is no answer to these authorities.

### D.    The National Environmental Policy Act

The Service seeks to wield its failure to review and regulate IDFG's wolf extermination program as a shield against NEPA liability, arguing that it has taken no "major Federal action."  See Fed. Br. 42-47.  But the Service's failure to take the discrete actions mandated by the Frank Church Wilderness Management Plan, NFMA, the Wilderness Act, and special-use permit regulations has quite the opposite effect, as "[i]t is clear from federal regulations" and this Court's precedent "that federal inaction can count as federal action for purposes of triggering the EIS requirement under NEPA."  Ramsey v. Kantor, 96 F.3d 434, 445 (9th Cir. 1996) (discussing 40 C.F.R. § 1508.18).

24

The Service does not challenge this principle but claims it is inapplicable because "the Service first learned of IDFG's wolf control plans in mid-December 2013 and learned of IDFG's further plans in February 2014," and the Service's "current status in analyzing IDFG's plans does not constitute final agency action, much less major federal action subject to the requirements of NEPA." Fed. Br. 46-47. But as explained supra, Point I, these assertions are inaccurate and cannot justify the Service's failure to comply with NEPA. Further, the wilderness management plan, NFMA, the Wilderness Act, and special-use permit regulations all mandated action by the Service before IDFG commenced wolf extermination in the wilderness; the Service's tardy review under 36 C.F.R. § 241.2 does not remedy its failure to act under those authorities or NEPA. See 40 C.F.R. § 1501.2 (NEPA regulations mandating that agencies undertake environmental review "at the earliest possible time" in decision-making process).

The Service's attempt to distinguish Ramsey is equally unavailing. See Fed. Br. 47. There, the Court made clear that it was the federal official's "mandatory obligation to review" the action of a multi-party fish management council that "suffice[d] to make his failure to disapprove major federal action under 40 C.F.R. § 1508.18," Ramsey, 96 F.3d at 445 (emphasis added)—not, as the Service argues, the fact that the council's plans automatically took effect if the federal official did not disapprove them, see Fed. Br. 47; see also Moore Br. 28. Under the wilderness

25

management plan and special-use permit regulations, the Service likewise had a

"mandatory obligation to review" and act on IDFG's plans before wolf

extermination commenced in the wilderness, and the Service's failure to discharge

that obligation is actionable under § 706(1) of the APA.  Accordingly, Ramsey—

and the plain language of 40 C.F.R. § 1508.18—is controlling.[10]

 The Service likewise fails to demonstrate that its authorization for IDFG to

use a federal cabin for wolf extermination triggered no NEPA obligations.  See

Fed. Br. 45-46.[11]  That the cabin authorization "did not constitute significant

funding of the project," Fed. Br. 45, is not dispositive because NEPA equally

applies to "projects and programs entirely or partly financed, assisted, conducted,

regulated, or approved by federal agencies."  40 C.F.R. § 1508.18 (emphasis

added); see Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d

---

[10] The Service's mandatory obligation to review and act on IDFG's plans also distinguishes this case from Alaska v. Andrus, 591 F.2d 537 (9th Cir. 1979), and Defenders of Wildlife v. Andrus, 627 F.2d 1238 (D.C. Cir. 1980), in which, as the Service itself describes, the federal agency merely "had the power to" prevent state wolf extermination, Fed. Br. 44 (emphasis added), not any mandatory "duty to control nonfederal action" that was enforceable under the APA, Sierra Club v. Hodel, 848 F.2d 1068, 1091 (10th Cir. 1988), overruled on other grounds by Vill. of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970 (10th Cir. 1992); see also Appellants' Br. 50-51 (further distinguishing Andrus cases).

[11] The Service does not dispute that waiving the special-use permit requirement under 36 C.F.R. § 251.50(e)(2) constitutes "major Federal action" triggering NEPA, assuming instead that the Court will indulge its advocacy of inconsistent positions in the district court and appellate proceedings as to whether it invoked § 251.50(e)(2).  See Fed. Br. 46.  For the reasons stated, the Court should not do so.

1105, 1116 (9th Cir. 2000) ("Deciding whether federal and non-federal activity are sufficiently interrelated to constitute a single 'federal action' for NEPA purposes will generally require a careful analysis of all facts and circumstances surrounding the relationship," and the degree of federal funding is one factor among many) (internal quotation omitted), abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv., 630 F.3d 1173 (9th Cir. 2011) (en banc).  The Service approved IDFG's use of the Cabin Creek cabin for wolf extermination and thereby assisted IDFG's effort; that no funds changed hands does not mean the Service can dispense with NEPA.

Further, Appellees' effort to distinguish White Tanks Concerned Citizens, Inc. v. Strock, 563 F.3d 1033 (9th Cir. 2009), and Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113 (9th Cir. 2005), on the ground that "use of the cabin was merely a convenience to IDFG, not a necessary prerequisite," Fed. Br. 46; accord Moore Br. 14-15, rests entirely on post-hoc affidavits generated for litigation.  See Point III.A, supra.  The Service's contemporaneous communications indicate that the cabin was necessary for IDFG's winter 2013-14 trapping activity, see ER 306 (District Ranger stating that IDFG was unable to house hunter-trapper on state property), and there is nothing in the administrative record to the contrary.  At a minimum, Appellants have raised serious questions as to whether use of the Cabin Creek cabin was necessary for IDFG to carry out its planned extermination of the

27

Golden Creek and Monumental Creek wolf packs, and whether the cabin

authorization provides a further basis for the Service's NEPA liability in addition

to its unlawful failure to act.

## V.    DIRECTOR MOORE'S STATE SOVEREIGNTY ARGUMENTS ARE MERITLESS

Director Moore erroneously asserts Eleventh Amendment immunity on the

basis that the APA "does not waive the sovereign immunity of state officials."

Moore Br. 11.  In so arguing, Director Moore ignores well-established precedent

holding that "federal courts have a form of pendent jurisdiction based upon

necessity over claims for injunctive relief brought against state actors in order to

preserve the integrity of federal remedies."  S. Carolina Wildlife Fed'n v.

Limehouse, 549 F.3d 324, 330 (4th Cir. 2008) (quotation and alteration omitted);

see also Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14 (1983) ("It is beyond

dispute that federal courts have jurisdiction over suits to enjoin state officials from

interfering with federal rights.") (citing Ex Parte Young, 209 U.S. 123, 160-62

(1908)).  Such necessity arises where, as here, NEPA review is a prerequisite to

federal approval of a nonfederal project.  Fund for Animals v. Lujan, 962 F.2d

1391, 1397 (9th Cir. 1992).[12]  Such necessity also arises where, as here, restraint of nonfederal action is essential to vindicate federal law protecting wilderness-quality lands.  See Sierra Club, 1096-97 (directing injunction against county road construction project bordering wilderness study area pending federal agency action to protect wilderness character).  In these circumstances, jurisdiction over federal defendants is founded on the APA but injunctive relief against nonfederal actors is available to enforce federal law.  Id. at 1076-78 ("[Plaintiff] cannot hope for complete relief if the County is not enjoined from construction during the pendency of the APA action against the federal defendants.").  "Were it otherwise, state action could render a [federal law] violation a 'fait accompli' and eviscerate the federal remedy."  S. Carolina Wildlife Fed'n, 549 F.3d at 331 (citation omitted).

Further, the argument that IDFG has free rein to exterminate wolf packs in a federal wilderness area without federal oversight—a theme throughout Director Moore's brief, see Moore Br. 8, 22, 25-26, 27—"proves too much."  Wyoming v. United States, 279 F.3d 1214, 1233 (10th Cir. 2002).  There is no dispute that

---

[12] Director Moore acknowledges Fund for Animals but seeks to limit its holding to situations where "'federal and state projects are sufficiently interrelated to constitute a single "federal action."'"  Moore Br. 13 (quoting 962 F.2d at 1397).  As Fund for Animals recognized, however, injunctive relief is equally proper where nonfederal action cannot proceed without federal approval.  962 F.2d at 1397.

IDFG retains general wildlife management responsibility within the Frank Church

Wilderness, but it is well settled that state jurisdiction extends "only in so far as

[its] exercise may not be incompatible with" the federal government's "paramount

powers" to "protect wildlife on the public lands, state law notwithstanding."

Kleppe v. New Mexico, 426 U.S. 529, 545-46 (1976) (internal quotations omitted)

(emphasis added); see also Wyoming, 279 F.3d at 1227 ("State jurisdiction over

federal land 'does not extend to any matter that is not consistent with the full

power of the United States to protect its lands [and] control their use'") (quoting

Utah Power & Light Co. v. United States, 243 U.S. 389, 404 (1917)); Nat'l

Audubon Soc'y v. Davis, 307 F.3d 835, 854 (9th Cir. 2002) (adopting Wyoming

analysis regarding limits on state authority to manage wildlife on federal lands);

accord Fed. Br. 35 & n.9.

 The Wilderness Act establishes a paramount federal interest in the Frank

Church Wilderness, directing that it be managed as "an area where the earth and its

community of life are untrammeled by man" and governed by "natural conditions."

16 U.S.C. § 1131(c).  Although Director Moore emphasizes that the Wilderness

Act and similar statutes include a "savings clause" addressing state wildlife

management, Moore Br. 23-24, such provisions are "not meant to eviscerate the

primacy of federal authority over [federal public lands] management," Nat'l

Audubon Soc'y, 307 F.3d at 854.  Were it otherwise, state actions could entirely

frustrate the management objectives established by Congress for the Frank Church

Wilderness; indeed, nothing in Director Moore's argument for unbridled state

authority would prevent IDFG from exterminating all predators—or even all

wildlife—from the wilderness.[13]

## VI.   APPELLANTS HAVE ESTABLISHED IRREPARABLE HARM AND THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR AN INJUNCTION

Appellees fail to justify the district court's erroneous irreparable harm

ruling.  In roughly one month's time over the 2013-14 winter, before Appellants

could obtain even emergency review from this Court, IDFG's hunter-trapper killed

nine wolves in the Middle Fork region of the Frank Church Wilderness, Gould

Decl. ¶¶ 2, 5, thereby reducing by nearly twenty percent the population of a species

that the Service itself has identified as integral to the area's wilderness character,

see SER 49 (IDFG official estimating Middle Fork wolf population of 50 at end of

2013); Wolf Recovery Found. v. U.S. Forest Serv., 692 F. Supp. 2d 1264, 1266 (D.

Idaho 2010).  IDFG plans to resume wolf extermination in December 2014 with

the goal of eliminating sixty percent of the Middle Fork area's resident wolves,

---

[13] Appellants do not "contend that the only state wildlife management activities" exempt from Forest Service permitting requirements "are recreational hunting and fishing."  Moore Br. 22.  Where state wildlife management is implemented in a manner "adequate to protect National Forest System lands and resources," the Service may waive the permit requirement.  36 C.F.R. § 251.50(e)(2).  But where, as here, state management threatens national forest resources, no waiver is available.  This framework does not threaten any legitimate state interest.

App. Ct. Dkt. 15, Appendix B, at 10-11 ("Predation Management Plan"), and

Appellees offer no assurance that Appellants will not face a similar inability to

obtain timely judicial review next winter. Accordingly, Appellants face an

imminent threat of irreparable harm absent injunctive relief from this Court.[14]

    In arguing to the contrary, Appellees repeat the district court's error by

insisting that Appellants establish a threat to the entire gray wolf species—or at

least the entire Northern Rocky Mountains population—before an injunction is

warranted. Fed. Br. 48-51; Moore Br. 36-39. But Appellants have documented a

specific interest in observing, hearing, and otherwise experiencing wolf packs

occupying the Middle Fork region of the Frank Church Wilderness and their

contribution to wilderness character. ER 19-49 (Appellants' declarations). That

interest is "undeniably a cognizable interest for purpose of standing," Lujan v.

---

[14] On the date Director Moore's opposition to Appellants' emergency injunction
motion was due in this Court, IDFG announced it was suspending wolf
extermination in the Frank Church Wilderness until July 1, 2014. See Gould Decl.
¶ 6. Faced with Appellants' continuing prosecution of this appeal and a district
court briefing schedule that extends beyond July 1, IDFG has extended the
suspension to December 1, 2014 and Director Moore therefore argues that
"interlocutory relief is not warranted." Moore Br. 9 (citation omitted). Director
Moore cannot defeat this appeal by repeatedly postponing resumption of the
challenged activity just long enough to argue against the need for appellate review.
Moreover, while Director Moore suggests uncertainty as "to what, if any, extent"
IDFG will resume wolf extermination in the Frank Church Wilderness, Moore Br.
32, IDFG's own Predation Management Plan calls for killing 60 percent of the
wilderness's Middle Fork wolf population to inflate elk numbers, Predation
Management Plan 10-11.

Defenders of Wildlife, 504 U.S. 555, 562-63 (1992) (citation omitted), and is

explicitly protected by the Wilderness Act, 16 U.S.C. §§ 1131(c), 1133(b).

Appellants are not required to establish a threat of injury to some broader interest

in global or regional wolf populations to secure an injunction protecting their

specific, documented environmental interest in the Middle Fork wolf population.

See Davis v. Mineta, 302 F.3d 1104, 1115 (10th Cir. 2002) (plaintiffs seeking

injunction must "make a specific showing that the environmental harm results in

irreparable injury to their specific environmental interests").

　　　Accordingly, both this Court and the Tenth Circuit have found irreparable

harm justifying preliminary injunctive relief where plaintiffs documented an

interest in wildlife occupying a specific area, without insisting that such plaintiffs

demonstrate a threat to the entire species.  See Humane Soc'y of U.S. v. Gutierrez,

523 F.3d 990, 991 (9th Cir. 2008); Greater Yellowstone Coal. v. Flowers, 321 F.3d

1250, 1256-58 (10th Cir. 2003).  Appellees seek to combat this authority with a

district court ruling rejecting an injunction request under the Endangered Species

Act.  Fed. Br. 10, 32, 34-35; Moore Br. 50-51 (citing Defenders of Wildlife v.

Salazar, 812 F. Supp. 2d 1205 (D. Mont. 2009)).  Appellants believe that ruling

was erroneous, but regardless it is inapposite because the irreparable-harm

determination rests "on the statutes that actually form the basis of plaintiffs'

claims."  Greater Yellowstone Coal., 321 F.3d at 1257.  The Wilderness Act

33

protects specific areas and their "community of life."  16 U.S.C. §§ 1131(c);

1133(b).  Its mandate "does not differentiate between harm to individual animals

and harm to the species as a whole" and does not support a species-level harm

requirement.  Greater Yellowstone Coal., 321 F.3d at 1257-58 (similar analysis

under Clean Water Act); see High Sierra Hikers, 390 F.3d at 642 (finding

irreparable harm from "reduction in the population" of sensitive species in

wilderness) (footnote omitted).[15]

Appellees dispute the threat of irreparable harm to the Frank Church

Wilderness based on "wolves' ability to reproduce and colonize unoccupied

territory."  Moore Br. 34 (citations omitted); accord Fed. Br. 49.  However, the

Service's contention that "wolf numbers will quickly rebound unless IDFG's

trapping efforts are sustained over a period of years," Fed. Br. 49 (emphasis

added), is cold comfort given IDFG's plans to sustain wolf killing for up to five

years to reduce the Middle Fork wolf population by sixty percent, App. Ct. Dkt.

15, Appendix A at 60 (Elk Management Plan), Predation Management Plan 10-11;

see also SER 40 (Forest Supervisor describing IDFG's goal of "sustained removals

---

[15] Fund for Animals v. Frizzell, 530 F.2d 982 (D.C. Cir. 1975) (cited in Moore Br.
10, 32, 36-37), which rejected the contention that "the loss of only one bird is
sufficient injury to warrant a preliminary injunction," id. at 987, is inapposite
where, as here, killing members of a species "would have a significant impact on
that species in the area" of plaintiffs' concern.  Greater Yellowstone Coal., 321
F.3d at 1256-57 (distinguishing Frizzell).

of 40 percent or more of wolves" in Middle Fork area).  Appellees cannot escape injunctive relief by ignoring the scope of IDFG's program.  More fundamentally, Appellees' theory would illogically mean that no single season's wolf-killing campaign could ever be enjoined because individually it would threaten only "a temporary decrease" in the population, Moore Br. 37, even though the intended impact of seasonal campaigns over successive years is a substantial long-term reduction in the wolf population and, therefore, diminished wilderness character within the Frank Church Wilderness.[16]

Finally, Appellees' interest in their "management prerogatives and discretion," Fed. Br. 52; see also Moore Br. 39-40, cannot outweigh the established public interest in preserving the Frank Church Wilderness "largely unimpaired by human activity," High Sierra Hikers, 390 F.3d at 643; see Appellants' Br. 57.  Appellees' claimed interest is further diminished because Appellants seek to compel the Service's compliance with mandatory procedural requirements that will provide the very opportunity that the law contemplates for the Service to exercise its "management prerogatives and discretion."  Fed. Br. 52.  Congress has placed a thumb on the scale in favor of equitable relief to preserve a federal wilderness,

---

[16] Nor does finding irreparable harm create "an irrational result in light of the allowance of recreational hunting [and] trapping" in the wilderness.  Moore Br. 34. As discussed supra, the entire purpose of IDFG's program is to reduce wolf numbers below what recreational hunting can achieve.

<u>High Sierra Hikers</u>, 390 F.3d at 643, and Appellees fail to assert a significant

countervailing interest.  A preliminary injunction is warranted.

       Respectfully submitted this 21st day of April, 2014.

      <u>  s/ Timothy J. Preso</u>
      Timothy J. Preso
      Katherine K. O'Brien
      Earthjustice
      313 East Main Street
      Bozeman, MT 59715
      (406) 586-9699 | Phone
      (406) 586-9695 | Fax

      *Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 8,398 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman.

Dated:  April 21, 2014

    s/ Timothy J. Preso

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Ninth Circuit by using the

appellate CM/ECF system on April 21, 2014.  I certify that all participants in this

case are registered CM/ECF users and that service will be accomplished by the

appellate CM/ECF system.


         /s/ Katherine K. O'Brien_____
        Katherine K. O'Brien